FILED
United States Court of Appeals
Tenth Circuit

**July 11, 2008**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ARTURO VICENTE-ELIAS,

        Petitioner,

v.

MICHAEL B. MUKASEY,
United States Attorney General,

        Respondent.

No. 07-9542

---

JAIME VICENTE-LOPEZ,

        Petitioner,

v.

MICHAEL B. MUKASEY,
United States Attorney General,

        Respondent.

No. 07-9545

---

**PETITION FOR REVIEW FROM
THE BOARD OF IMMIGRATION APPEALS**

---

Submitted on the briefs:*

---

\*     After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is

(continued...)

Jim Salvator, of Lafayette, Colorado, for Petitioners.

Mark C. Walters, Assistant Director, and Peter H. Matson, Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

Michelle G. Latour, Assistant Director, and R. Alexander Goring, Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

Before **McCONNELL**, **ANDERSON**, and **BRORBY**, Circuit Judges.

**BRORBY**, Circuit Judge.

Arturo Vicente-Elias and Jaime Vicente-Lopez petition for review of final orders for their removal to Guatemala. These cases involve very similar facts and legal issues and we have elected to resolve them together in a single decision. As explained below, we deny both petitions for review.

Mr. Vicente-Elias applied for asylum, restriction on removal, and relief under the Convention Against Torture (CAT). After an Immigration Judge denied relief, he appealed the first two matters to the Board of Immigration Appeals.[1]

---

*(...continued)
therefore ordered submitted without oral argument.

[1]     Mr. Elias has ignored the question of CAT relief before this court as well. Of course, having failed to appeal the IJ's ruling in this regard to the BIA, he is now barred from pursing it based on exhaustion principles. *Rivera-Zurita v. INS*, 946 F.2d 118, 120 n.2 (10th Cir. 1991).

The BIA affirmed without opinion under 8 C.F.R. § 1003.1(e)(4), making the IJ's decision on asylum and restriction on removal the final agency determination for purpose of our review under 8 U.S.C. § 1252(a)(1). *Uanreroro v. Gonzales*, 443 F.3d 1197, 1203 (10th Cir. 2006). Mr. Vicente-Lopez also unsuccessfully applied for asylum, restriction on removal, and CAT relief, but in his case a BIA member issued an opinion under 8 C.F.R. § 1003.1(e)(5), which serves as the final agency determination, though we may consult the IJ's decision to explicate the BIA's analysis. *Uanreroro*, 443 F.3d at 1203-04. Mr. Vicente-Lopez has limited his petition for review to the denial of restriction on removal.

## Economic Deprivation as Persecution

Petitioners are of Mayan ancestry and speak the Quiche language, which puts them at an economic disadvantage in Guatemala, where Spanish-speakers refuse to employ native Americans who communicate in indigenous languages. Petitioners' resultant poverty, rather than the imposition or threat of physical harm, underlies their claims for relief from removal. Because both asylum and restriction on removal turn on a showing of persecution, *see Wiransane v. Ashcroft*, 366 F.3d 889, 892-93 (10th Cir. 2004), the standard for determining when economic deprivation rises to the level of persecution is a primary focus of both petitions.

The BIA recently clarified that standard in *In re T-Z-*, 24 I. & N. Dec. 163 (BIA 2007), issued after the IJ decisions in petitioners' cases but while their

administrative appeals were pending.  The BIA noted it had at times referred to

(1) "deliberate imposition of substantial economic disadvantage," a formulation

used by the Ninth Circuit in *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir. 1969), and

at other times to (2) "economic deprivation or restrictions so severe that they

constitute a threat to an individual's life or freedom," a formulation from *Matter

of Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985), *overruled on other grounds by

INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987).  *In re T-Z-*, 24 I. & N. Dec. at 170

(internal quotations omitted).  The BIA did not reject either formulation in favor

of the other.  Instead, it reaffirmed a prior decision, *Matter of Laipenieks*, 18 I. &

N. Dec. 433 (BIA 1983), *rev'd on other grounds*, 750 F.2d 1427 (9th Cir. 1985),

that had held them to be alternative, rather than mutually exclusive, ways to

demonstrate non-physical persecution, finding this dual approach supported by

relevant Congressional commentary.  *In re T-Z-*, 24 I. & N. Dec. at 171 (citing

H.R. Rep. No. 95-1452, at 5-6, *reprinted in* 1978 U.S.C.C.A.N. 4700, 4704-05).

And, consistent with this legislative source, the BIA revised the *Kovac*

formulation to require a "severe" rather than merely "substantial" economic

disadvantage.  *Id.* at 172-73.

It may seem that the *Kovac* test, which does not require that the economic

deprivation necessarily threaten life or freedom, and the *Acosta* test, which does,

are not mutually compatible.  *See generally* Jonathan L. Falkler, *Economic

Mistreatment as Persecution in Asylum Claims:  Towards a Consistent Standard*,

2007 U. Chi. Legal F. 471, 484-85 (2007). But the BIA resolved this tension by indicating that these tests naturally apply to different situations; in particular, that the *Kovac* test can support asylum absent a threat to life or freedom if an alien has suffered a severe *loss* of an *existing* economic/vocational advantage:

> [T]here may be situations in which, for example, an extraordinarily severe fine or wholesale seizure of assets may be so severe as to amount to persecution, even though the basic necessities of life might still be attainable. . . . This form of persecution is covered by the 'economic disadvantage' test in *Kovac* . . .
>
> . . . .
>
> [An alien] need not demonstrate a total deprivation of livelihood or a total withdrawal of all economic opportunity in order to demonstrate harm amounting to persecution [under] *Kovac* . . . Government sanctions that reduce an applicant to an impoverished existence may amount to persecution even if the victim retains the ability to afford the bare essentials of life. A particularly onerous fine, a large-scale confiscation of property, or a sweeping limitation of opportunities to continue to work in an established profession or business may amount to persecution even though the applicant could otherwise survive.

*In re T-Z-*, 24 I. & N. Dec. at 171, 173-74; *see also id.* at 174-75 (noting several case-law examples of losses properly analyzed under *Kovac* test).

In sum, *In re T-Z-* reaffirmed a dual standard for economic deprivation that the BIA had applied, albeit at times unclearly (often under one alternative without explicit acknowledgment of the other), since *Matter of Laipenieks*. In some situations, the focus is on whether conditions for an alien have been or will be so impoverished as to support a finding of persecution, and *Acosta's* "threat to life

or freedom" test naturally applies; in other situations, the focus is on whether an alien has been or will be subjected to an economic loss that, though sparing the bare essentials of life, nevertheless supports a finding of persecution, and *Kovac's* "imposition of severe economic disadvantage" test is appropriate.[2]  With this understanding, we turn to the matters currently under review.[3]

### Petition of Mr. Vicente-Elias

Mr. Vicente-Elias argues (1) that the IJ used an incorrect legal standard for economic persecution in his case, and (2) that under any standard, even the one used by the IJ, the facts in his case demonstrate persecution.  Before getting into more specific points, we note that Mr. Vicente-Elias did not argue on appeal to the BIA that the IJ had used an incorrect legal standard in assessing his claim of economic persecution.  Indeed, at that time Mr. Vicente-Elias himself invoked various formulations of that standard without voicing any objection regarding their variability.  *See* Admin. R. at 7-13.  In any event, even if his appeal of the

---

[2]     Of course, to qualify an alien for asylum as a refugee, the deprivation must be (1) "on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42), and (2) imposed "by the government [or] by a non-governmental group that the government is unwilling or unable to control," *Estrada-Escobar v. Ashcroft*, 376 F.3d 1042, 1046 (10th Cir. 2004) (internal quotation omitted).  Neither of these conditions is in dispute here.

[3]     As the parties have not questioned the clarified standard set out *In re T-Z-*, but only whether the decisions under review are consistent with it, "we assume, without deciding, that [this standard] is valid, and we have no occasion to decide what level of deference, if any, [it is] due."  *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 563 n.10 (1999).

IJ's findings on persecution were deemed sufficient to preserve a tacit objection to the underlying standard, that would not avail him here. The IJ clearly applied the *Acosta* test, *see id.* at 41,[4] which was consistent with *In re T-Z-* under the circumstances (detailed below) involving general economic disadvantage but no seizure or loss of property, assets, or professional occupation/status that would implicate the *Kovac* test. Indeed, the BIA summarily affirmed the IJ's decision shortly *after* issuing its opinion in *In re T-Z-*. We turn, then, to the application of the *Acosta* test to the facts in evidence.

Mr. Vicente-Elias testified that he left Guatemala to escape extreme poverty. Admin. R. at 56. Employment opportunities for Quiche speakers were minimal. *Id.* at 57. Work could sometimes be found within the (poor) indigenous community, *id.* at 60-61, as his father's experience showed, *id.* 63-64, but he explained that farther away the (wealthier) Spanish-speaking population "d[id] not allow us to work because they prefer to work with people who speak Spanish." *Id.* at 57-58; *see id.* at 74 ("[T]he first thing they ask you is if you speak Spanish, and if you say no, then they tell you that there is no work for you."). School was not free, so this cycle of linguistic limitation and economic

---

[4]    The IJ specifically approved as "a correct explanation of the law" the rule that economic persecution may be found "where the applicant's life or freedom would be jeopardized." Admin. R. at 41. The IJ also noted that "other cases" had held such persecution could be shown by the loss "of all the means of earning a living." *Id.* Mr. Vicente-Elias objects that the latter formulation is unduly strict. But, as that formulation was used, if at all, merely to supplement rather than to supersede the *Acosta* test, this objection is not material to the result here.

disadvantage perpetuated itself: his Quiche-speaking father could not afford to send him to school and, as a result, he failed to learn the Spanish necessary to gain a foothold in the workplace as well. *See id.* at 57-58. He was able to find work in his teens when a labor recruiter, who spoke Quiche, would come through his village in a truck and drive men to the coast to clean up and cultivate the land. *Id.* at 65-66. But pay was less than a dollar a day. *Id.* at 73-74. Like others in the community, his family also grew some crops, including corn, potatoes, and wheat, *id.* at 69, and raising animals such as sheep, cows, and chickens brought money for clothes, *id.* at 70. There were, however, times when there was not enough to eat, *id.* at 56, or money for clothing, *id.* at 59, and his family had to rely on home herbal remedies for medical care, *id.* at 59-60.

There was little testimony about discrimination against indigenous people distinct from the employment problems related to the Quiche–Spanish language barrier. Mr. Vicente-Elias stated that Spanish-speaking people "don't treat [indigenous people] right" and "don't like us," *id.* at 61, but he did not flesh out these vague generalities with any specific incidents of ill treatment. Indeed, at other points he specifically denied that he had ever been harmed or threatened while living in Guatemala. *Id.* at 57, 70.

The 2004 State Department country report for Guatemala submitted to the IJ was consistent with the thrust of Mr. Vicente-Elias' testimony about adverse conditions for indigenous people, but did not add much to it. As for the economy

in general, the report noted there was "a marked disparity in income distribution, and poverty was pervasive. . . . Approximately 57 percent of the total population and 71 percent of persons in rural areas lived in poverty; 22 percent of the population lived in extreme poverty." *Id.* at 84. This disproportionately affected indigenous people: "76 percent of the indigenous population lived in poverty, in comparison with 41 percent of the non-indigenous population." *Id.* at 98. "Rural indigenous people had limited educational opportunities and fewer employment opportunities. . . . Many indigenous people were illiterate, and approximately a third did not speak Spanish[.]" *Id.* at 99.

The IJ found Mr. Vicente-Elias "a very credible witness," *id.* at 39, and, based on his testimony and the country report, found that "there remains racial discrimination and discrimination due to language ability" with the result that the "[i]ndigenous people of Guatemala do not have equal access to employment opportunities or educational opportunities." *Id.* at 40. Applying the standard for economic deprivation discussed earlier, however, the IJ found "the economic and employment discrimination faced by [Mr. Vicente-Elias] does not reach the level of hardship which would qualify . . . as persecution." *Id.* at 41. The IJ also cited this court's observation that, while deplorable in any free society, "'[e]mployment discrimination . . . does not without more constitute persecution'" for purposes of asylum. *Id.* (quoting *Vatulev v. Ashcroft*, 354 F.3d 1207, 1210 (10th Cir. 2003)).

Accordingly, the IJ concluded that neither asylum nor restriction on removal could be granted. *Id.* at 41-42.

While we review the IJ's legal conclusions de novo, we review matters of fact using a deferential substantial-evidence standard under which the IJ's findings "'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005) (quoting 8 U.S.C. § 1252(b)(4)(B)). In this circuit, the ultimate determination whether an alien has demonstrated persecution is a question of fact, even if the underlying factual circumstances are not in dispute and the only issue is whether those circumstances qualify as persecution. *Nazaraghaie v. INS*, 102 F.3d 460, 463 n.2 (10th Cir. 1996) (holding precedent "forecloses any argument that the application of a correct legal definition [for persecution] to the facts of a specific case is a mixed question of law and fact, to be reviewed under some standard less deferential than substantial evidence").[5] Accordingly, we must affirm the IJ's determination that a given set of circumstances does not constitute persecution unless "[w]e can[] conclude that every reasonable fact-finder would be compelled to find persecution based on [those circumstances]." *Tulengkey*, 425 F.3d at 1281.

---

[5]    Some circuits deem this a mixed question calling for de novo review. *See, e.g.*, *Sun Wen Chen v. Att'y Gen.*, 491 F.3d 100, 109-10 (3d Cir. 2007); *Mirzoyan v. Gonzales,* 457 F.3d 217, 220 (2d Cir. 2006) (per curiam).

Mr. Vicente-Elias comes from a family of five children. There is no evidence that their lives, or those of any others in the larger Mayan community, are or have been threatened by economic circumstances. Nor is there evidence that they face a potential loss of freedom through some form of confinement, enforced servitude, or the like. Paying work has been available at times, animal husbandry supplements income, and farming provides food. The community has an exchange economy that its members use in the absence of money. We do not minimize the real poverty faced by Mr. Vicente-Elias and other indigenous people in Guatemala. But, applying the appropriate standard from *Acosta* to the economic evidence, as the IJ did, we cannot say every reasonable fact-finder would be compelled to disagree with the IJ and find the economic disadvantages shown here to be so severe as to threaten life or freedom.

Mr. Vicente-Elias broadly objects that the IJ considered the economic deprivation in isolation from other disadvantages faced by the indigenous people of Guatemala.[6] There is no merit to this objection. In addition to specifically economic/employment-related problems, the IJ noted the limited educational

---

[6]     He also objects more specifically that the IJ did not discuss the lack of medical care. His testimony related one particular instance—that his mother died for want of medication. But this testimony was so conclusory, speculative, and lacking in foundation that we cannot say the IJ erred by not expressly considering it. Mr. Vicente-Elias admitted he did not even know what the cause of his mother's death was, and the only basis for attributing her death to a lack of medical care was that he said his father told him that he believed she died "because there was no medication to make her better." Admin. R. at 64.

opportunities for indigenous people, as well as the general social discrimination that Mr. Vicente-Elias himself had referred to in only vague terms. The IJ then applied both the *Acosta* standard and the general principle that discrimination is not the equivalent of persecution, *Vatulev*, 354 F.3d at 1210, to conclude that "[i]n sum, . . . the situation faced by [Mr. Vicente-Elias] in Guatemala, although reprehensible is not sufficiently severe to amount to persecution." Admin. R. at 41.

In a similar vein, Mr. Vicente-Elias insists that the IJ did not adequately consider the "pattern or practice" of persecution against Mayans. This argument is also unavailing. The point of such evidence is to provide a broader basis for an objective fear of future persecution: an alien may establish a well-founded fear of persecution "by demonstrating his membership in a group . . . subject to a pattern or practice of persecution. In other words, an applicant is permitted to show that a person in his position, as opposed to himself specifically, could be subject to persecution." *Wiransane*, 366 F.3d at 893-94 (internal citations and quotations omitted). Yet what Mr. Vicente-Elias discusses in this connection are long-ago atrocities of the Guatemalan civil war rather than practices that might have a bearing on the treatment a person of his ethnic/linguistic group could expect if now returned to Guatemala. Insofar as his argument does rely on more relevant recent conditions, it does not address the basic deficiency in his case recognized

by the IJ: those conditions, though indicative of social discrimination and economic disadvantage, do not constitute persecution.

In addition to asylum based on future persecution—established directly or through reliance on a presumption of future persecution raised by past persecution that the government has not rebutted—an alien may seek "humanitarian asylum" based exclusively on past persecution "so severe that it demonstrates 'compelling reasons for being unwilling to return.'" *Yuk v. Ashcroft*, 355 F.3d 1222, 1232-33 (10th Cir. 2004) (quoting earlier version of 8 C.F.R. § 208.13(b)(1)(iii)(A), which now refers to compelling reasons for being "unwilling or unable to return"). We have characterized this level of past persecution as "that [which] would so sear a person with distressing associations with his native country that it would be inhumane to force him to return there, even though he is in no danger of future persecution." *Krastev v. INS*, 292 F.3d 1268, 1280 (10th Cir. 2002) (internal quotation omitted). Examples falling within this extraordinary category include survivors of the holocaust and the Khmer Rouge genocide. *Id.* Mr. Vicente-Elias contends he is entitled to asylum on this basis in light of the atrocities of the Guatemalan civil war, which ravaged the country for more than three decades until 1996. But he did not testify or offer any evidence that remotely suggested that the war had any direct effect on him, his family, or even anyone in his community. And, as we have seen, those conditions that he did relate in his testimony did not

constitute persecution, much less rise to the level of persecution necessary to warrant humanitarian asylum.

Finally, Mr. Vicente-Elias complains at some length and with considerable indignation about historical U.S. involvement in the Guatemalan civil war. This is simply not relevant to the question of persecution that controls the disposition of his claims for asylum and restriction on removal.

For the above reasons, we discern no error in the IJ's determination that Mr. Vicente-Elias did not suffer persecution in the past and does not have a well-founded fear of persecution upon his return to Guatemala. He was therefore properly found unqualified for asylum and (a fortiori) for restriction on removal. *Solomon v. Gonzales*, 454 F.3d 1160, 1163 (10th Cir. 2006). Accordingly, we deny his petition for review.

## Petition of Mr. Vicente-Lopez

As noted earlier, the BIA issued an opinion in Mr. Vicente-Lopez's case, so we review its decision. Moreover, the BIA issued its opinion here after it had clarified the standard for economic persecution in *In re T-Z-*. While the BIA did not refer specifically to *In re T-Z-*, it did not say anything to suggest that it was deviating from the standard it had recently taken pains to clarify. We therefore turn directly to the record and review whether the BIA's decision is supported by substantial evidence in light of *In re T-Z-*.

-14-

The testimony about economic persecution here was weaker than it was in the case of Mr. Vicente-Elias.[7] Mr. Vicente-Lopez offered only generalities that were vague as to substance, scope of application, or both: he left Guatemala due to "[t]he poverty," Admin. R. at 104; his family was "poor," *id.* at 122; "there is no money over there," *id.* at 110; "there are people that are poor and the other ones, don't have clothes or shoes or anything," *id.* at 111; and "we don't have any money, we don't have any clothes,"[8] *id.* at 112. He also testified that he had only three years of school, but did not attribute that to economic necessity. *Id.* at 114. This testimony was insufficient to establish economic persecution and certainly would not compel a factfinder to resolve the matter in a manner contrary to the finding of the BIA.

Mr. Vicente-Lopez admitted that no one ever harmed him, *id.* at 106, 108, but he did cite two incidents of physical harm to members of his family. He was told that his father had been sprayed in the eye with a toxic substance, causing a two to three week disability, for walking on property owned by Latinos. *Id.* at 106, 108-09, 121, 123-25. He also believes that his cousin was poisoned, though

---

[7]     The 2005 Country Report submitted by Mr. Vicente-Lopez was similar in material respects to the 2004 Country Report submitted by Mr. Vicente-Elias.

[8]     The general references to indigenous people lacking clothing were clearly not literal; Mr. Vicente-Lopez also testified that Latinos could identify them because "our clothes are different than theirs," Admin. R. at 107. And, as for references that might suggest that there are those so unfortunate as to truly lack clothing, these were not tied in any way to Mr. Vicente-Lopez himself.

he does not know who did it or what happened (he speculated that it was because his cousin was poor). *Id.* at 110-12, 122. These incidents cannot support a claim of persecution, however, as the BIA found that Mr. Vicente-Lopez "did not demonstrate that this harm was on account of a protected ground, particularly one related to [himself]," *id.* at 25, and the scant factual record on the matter is plainly insufficient to compel a finding to the contrary.

The only specific testimony about ethnic mistreatment was that members of Mr. Vicente-Lopez's family were subjected to verbal abuse, what he characterized as "bad words," from Latinos. *Id.* at 108-10. Such conduct, though repugnant, is not a sufficient basis to compel a finding of persecution. *Vatulev*, 354 F.3d at 1210 ("[E]thnic slurs . . . are odious, but . . . fall far short of what would compel a reasonable factfinder to [find] persecution."). Mr. Vicente-Lopez seeks to bolster his overall case for persecution with a "pattern or practice" argument much like that advanced by Mr. Vicente-Elias, which fails for similar reasons.

Mr. Vicente-Lopez also includes in his briefing a general account of the Guatemalan civil war similar to that given by Mr. Vicente-Elias, evidently to support humanitarian asylum. But, as Mr. Vicente-Lopez limited his petition for review to the denial of restriction on removal,[9] humanitarian asylum is simply not

---

[9] His application for asylum was denied as untimely, a matter that, absent a legal or constitutional defect, this court would have lacked jurisdiction to review. *Diallo v. Gonzales*, 447 F.3d 1274, 1281 (10th Cir. 2006).

before us. Of course, if it were, our conclusion here would be no different than it was in Mr. Vicente-Elias's case.

Finally, Mr. Vicente-Lopez asserts a fairly novel substantive due process claim: "Do the massacres of the Mayans in Guatemala in [the] 1980's sponsored by the United States shock the conscience and therefore require relief in this case?" Aplt. Opening Br. at 75. He did not raise this claim to the BIA. Because aliens must, under 8 U.S.C. § 1252(d)(1), exhaust their administrative remedies, "we generally assert jurisdiction only over those arguments that [an alien] properly presents to the BIA." *Sidabutar v. Gonzales*, 503 F.3d 1116, 1118 (10th Cir. 2007). But § 1252(d)(1) requires exhaustion only of "remedies available to the alien as of right." Thus, we have not required exhaustion of "constitutional challenges to the immigration laws, because the BIA has no jurisdiction to review such claims." *Akinwunmi v. INS*, 194 F.3d 1340, 1341 (10th Cir. 1999) (per curiam). Indeed, it is more broadly recognized that the BIA lacks authority to resolve constitutional questions as a general matter and, hence, that this exhaustion exception extends to constitutional issues per se. *See, e.g.*, *Tall v. Mukasey*, 517 F.3d 1115, 1120 (9th Cir. 2008); *Colaianni v. INS*, 490 F.3d 185, 187 (2d Cir. 2007) (per curiam); *Kokar v. Gonzales*, 478 F.3d 803, 808 (7th Cir. 2007); *Geach v. Chertoff*, 444 F.3d 940, 945 (8th Cir. 2006). The only caveat is that objections to procedural errors or defects that the BIA could have remedied must be exhausted even if the alien later attempts to frame them in terms of constitutional

-17-

due process on judicial review. *Tall*, 517 F.3d at 1120; *Kokar*, 478 F.3d at 808; *Geach*, 444 F.3d at 945; *see Soberanes v. Comfort*, 388 F.3d 1305, 1309 (10th Cir. 2004) (quoting *Akinwunmi*). Thus, it appears Mr. Vicente-Lopez's substantive due process claim—which does not challenge an administratively correctable procedural defect but, rather, asserts a substantive constitutional claim for relief independent of the statutory provisions the BIA is authorized to enforce—is not subject to the exhaustion bar.

Mr. Vicente-Lopez attempts to premise this claim on the "state created danger" or "danger creation" theory recognized as a basis for substantive due process claims in actions against state officers under 42 U.S.C. § 1983. *See generally Christiansen v. City of Tulsa*, 332 F.3d 1270, 1279-82 (10th Cir. 2003); *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1262 (10th Cir. 1998). In essence, he argues that adverse conditions in an alien's home country attributed to foreign policy actions of the U.S. government are the equivalent of domestic state-created dangers in the § 1983 context, and that a prohibition on the alien's removal (where removal would otherwise be proper under immigration law) should be imposed on the government as an equitable remedy. Similar efforts to extend the "state created danger" theory to the context of immigration review, and thereby judicially engraft a new form of relief from removal onto the statutory scheme established by Congress, have been squarely rejected by two other circuits. *See Enwonwu v. Gonzales*, 438 F.3d 22, 29-31 (1st Cir. 2006); *Kamara v. Att'y*

*Gen.*, 420 F.3d 202, 216-18 (3d Cir. 2005). These cases are soundly reasoned, and we follow their lead here.

For the above reasons, we discern no error in the BIA's determination that Mr. Vicente-Lopez failed to qualify for restriction on removal.

The petitions for review in both of these matters are DENIED. Petitioners' motions to proceed in forma pauperis are GRANTED. Mr. Vicente-Elias's motion to file an oversized reply brief is GRANTED.