**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 8, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

EDWARD NKUGWA KIRONDE
NALWAMBA,

  Petitioner,

v.

ERIC H. HOLDER, JR.,
United States Attorney General,

  Respondent.

No. 08-9587
(Petition for Review)

---

**ORDER**

---

Before **HENRY**, Chief Judge, **BRORBY**, Senior Circuit Judge, and **HARTZ**, Circuit Judge.

---

This matter is before the court on Mr. Nalwamba's petition for panel rehearing and suggestion for rehearing en banc. The panel has voted to deny the petition for panel rehearing. The en banc request was circulated to all of the judges of the court who are in regular active service. No judge called for a poll. Accordingly, the suggestion for rehearing en banc is denied.

The panel, however, has sua sponte decided to amend the order and judgment that was originally filed on December 2, 2009. An amended order and

judgment and an amended concurrence by Chief Judge Henry are attached to this order. The Clerk is directed to file the amended decision forthwith.

Entered for the Court,

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

April 8, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

EDWARD NKUGWA KIRONDE
NALWAMBA,

        Petitioner,

v.

ERIC H. HOLDER, JR.,
United States Attorney General,

        Respondent.

No. 08-9587
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **HENRY**, Chief Judge, **BRORBY**, Senior Circuit Judge, and **HARTZ**,
Circuit Judge.

_____

Edward Nkugwa Kironde Nalwamba seeks judicial review of a decision by

the Board of Immigration Appeals (BIA) affirming the denial by an immigration

judge (IJ) of his requests for asylum, restriction on removal, and protection under

the Convention Against Torture (CAT).  Mr. Nalwamba claims that the BIA failed

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is
therefore ordered submitted without oral argument.  This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,
and collateral estoppel.  It may be cited, however, for its persuasive value
consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

to consider the cumulative impact of his past mistreatment; mischaracterized his experiences as harassment rather than persecution; found improved country conditions without evidentiary support; and improperly denied his torture claim. We dismiss Mr. Nalwamba's first claim for lack of jurisdiction. Because substantial evidence supports the BIA's decision on the remaining claims, we deny the petition for review as to those claims.

**I**

Mr. Nalwamba is a native and citizen of Uganda. He entered the United States in 2002 on a visitor visa, but overstayed his visit. When the Department of Homeland Security (DHS) initiated removal proceedings, Mr. Nalwamba conceded that he was removable but applied for asylum, restriction on removal, and CAT protection. Although he failed to appear for his initial hearing and was ordered removed in absentia, the BIA rescinded the removal order and remanded the matter to an IJ for further proceedings.

At his new hearing Mr. Nalwamba testified that he was an ordained priest who had publicly condemned human rights abuses committed by the Ugandan government. In his asylum application, he explained that the events that prompted him to seek asylum could be traced back to the rule of Idi Amin in the 1970s. Admin. R. at 312. He detailed a number of incidents of alleged persecution during Amin's regime and during the regime of Milton Obote, after Amin was removed from power. *See id*. at 312-313. Before the IJ, however,

Mr. Nalwamba focused on events that occurred after Ugandan President Museveni took office in 1986. Several of these events involved warnings and name-calling, but no physical abuse. First, because he gave refuge to a pregnant woman (apparently married to an antigovernment soldier) and her eight children, officers came to his home on three occasions to tell him "to find a way of getting rid of her." *Id*. at 161. Next, after he intervened when several revenue officers knocked a fruit vendor off his bicycle, officers began to call him the "fene pastor," *id.* at 164, referring to the fruit carried by the bicyclist. Later, as a result of his public opposition to the government's position on land ownership, he received three official visits telling him to "stop making political statements in public," *id.* at 165, and he was warned not to become a "stumbling block" for government policies, *id.* at 165–66.

Two subsequent episodes were more ominous. During the 2001 elections, supporters of President Museveni came to his church and directed him to encourage his congregation to vote for Museveni. Instead, Mr. Nalwamba told the members of his congregation to educate themselves and vote their opinions. The Museveni supporters responded by "storm[ing] out of the church [as] they wagged their finger[s]," a gesture Mr. Nalwamba interpreted as a sign of "trouble ahead." *Id*. at 168. About two weeks later, security agents took Mr. Nalwamba and a number of neighbors from their homes in the middle of the night and forced them to walk to a field where they were made to lie on the ground. They were

then taken to a "government clinic." *Id.* at 171. There he was interrogated about his affiliation with an opposition group and arms imports. When he denied any involvement, he was released with a warning to stop his activities.

In the final incident, Mr. Nalwamba was kidnapped on the street, blindfolded, and taken to a house where he was accused of plotting to come to the United States to join an opposition leader. He was warned that if he ever went to the "airport to try and fly out of the country[, he would] never come out alive." *Id.* at 176. He was released at a location "where soldiers used to kill people." *Id.* at 177.

After this last incident, Mr. Nalwamba's friends persuaded him to attend a religious conference in the United States, helping with the necessary funding and devising a plan for him to travel by bus to Kenya, where he would then fly to Cairo and the United States. Mr. Nalwamba executed this plan using his own passport. Once in the United States, he attended the religious conference and stayed to visit with a friend for a couple months. During that time his friends and family in Uganda told him that security and political conditions there were deteriorating and human-rights abuses were increasing, so he should remain in the United States. He also testified that he received a fax from Uganda that was picked up for him at a Denver church. He said that the threats in the fax made him fear for his life, particularly because it demonstrated that his whereabouts were known.

-4-

In addition to his own testimony, Mr. Nalwamba called as a witness Dr. Joel Barkan, an expert in Ugandan politics and society. Dr. Barkan said that people like Mr. Nalwamba would be subject to harassment under the Museveni regime, and that some opposition activists had been tortured and incarcerated. Mr. Nalwamba also submitted a 2004 Human Rights Watch report on human-rights abuses in Uganda.

The IJ found Mr. Nalwamba credible in most respects but deficient in satisfying the standards for relief. With respect to past persecution, the IJ concluded that the episodes before Museveni came to power in January 1986 were "removed in time to such an extent that they are of limited relevance," *id.* at 9, and that the events occurring during the Museveni regime, after 1986, amounted to harassment, not persecution, *id.* at 17. In addition, the IJ found that Mr. Nalwamba did not have a well-founded fear of future persecution. Because Mr. Nalwamba had not demonstrated past persecution or a well-founded fear of future persecution, the IJ denied his claim for asylum. The IJ also determined that Mr. Nalwamba had failed to meet the higher standard of proof necessary for restriction on removal and that he had failed to show that it was more likely than not that he would be tortured if he returned to Uganda.

In his appeal to the BIA, Mr. Nalwamba argued that the IJ had erred in denying his claims for asylum, restriction on removal and relief under the CAT. But he did not address the IJ's conclusion that the alleged incidents of persecution

prior to the Museveni regime were of limited relevance, nor did he argue that the IJ should have considered the cumulative impact of all the incidents of alleged persecution from the 1970s to 2001. Instead, he focused his challenge to the IJ's treatment of his asylum claim on the IJ's determination that the events that occurred during the Museveni regime constituted harassment and not persecution. *See id.* at 57-60; 90-91. The BIA affirmed the IJ's denial of Mr. Nalwamba's asylum claim, concluding that Mr. Nalwamba had not established that any harm he experienced rose to the level of persecution and that he had not demonstrated a well-founded fear of future persecution. The BIA also affirmed the IJ's denial of Mr. Nalwamba's other claims for relief.

## II

We must first address our jurisdiction to review the claims in Mr. Nalwamba's petition for review. "[W]e only retain jurisdiction over claims challenging a final order of removal 'if the alien has exhausted all administrative remedies available . . . as of right.'" *Torres de la Cruz v. Maurer*, 483 F.3d 1013, 1017 (10th Cir. 2007) (quoting 8 U.S.C. § 1252(d)(1)). We have further explained that "neglecting to take an appeal to the BIA constitutes a failure to exhaust administrative remedies as to any issue that could have been raised, negating the jurisdiction necessary for subsequent judicial review." *Id.* (brackets and internal quotation marks omitted). We therefore "have jurisdiction only over those claims that were presented to the BIA." *Id.*

On appeal Mr. Nalwamba challenges the IJ's characterization of his earlier period of mistreatment at the hands of government officials as "too 'remote' in time to be relevant to [his] asylum claim." Pet'r Br. at 18. He argues that the agency erred by "disregarding decades of abuse at the hands of government officials, and failing to consider the cumulative effect of multiple incidents of persecution by government actors." *Id*. But Mr. Nalwamba did not ask the BIA to consider, nor did the BIA analyze,[1] whether the IJ erred in concluding that the incidents of alleged persecution prior to the Museveni regime were of limited relevance or whether the IJ erred in failing to consider those incidents as part of the cumulative impact of Mr. Nalwamba's mistreatment from the 1970s to 2001. Because Mr. Nalwamba failed to exhaust this claim, we are deprived of jurisdiction to hear it. Accordingly, we dismiss this claim for lack of jurisdiction.

We retain jurisdiction to consider the remaining claims in Mr. Nalwamba's petition for review: (A) whether the BIA erred in affirming the IJ's decision that his mistreatment during the Museveni regime constituted harassment instead of persecution; (B) whether the BIA erred in affirming the IJ's decision that conditions have improved in Uganda; and (C) whether the BIA erred in affirming the IJ's decision that Mr. Nalwamba failed to demonstrate that he is likely to be

---

[1]    If the BIA had *sua sponte* addressed this claim in its order, then we would have jurisdiction to consider it, *see Sidabutar v. Gonzales*, 503 F.3d 1116, 1118-1122 (10th Cir. 2007); but that is not the case here, *see* Admin. R. at 2-3.

tortured if removed to Uganda. For the following reasons, we deny these claims on the merits.

## III

"We review BIA legal determinations de novo," *Herrera-Castillo v. Holder*, 573 F.3d 1004, 1007 (10th Cir. 2009), *petition for cert. filed* (Jan. 25, 2010) (No. 09-9834), and factual findings for substantial evidence, *see Vicente-Elias v. Mukasey*, 532 F.3d 1086, 1091 (10th Cir. 2008). Under the substantial-evidence standard, agency findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (internal quotation marks omitted). "[T]he ultimate determination whether an alien has demonstrated persecution is a question of fact, even if the underlying factual circumstances are not in dispute and the only issue is whether those circumstances qualify as persecution." *Id.*

Where, as here, a single member of the BIA issues a brief order affirming the IJ's decision, we "will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance." *Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007) (internal quotation marks omitted). We may, however, "consult the IJ's opinion to the extent that the BIA relied upon or incorporated it." *Id.*

To qualify for asylum, an alien must show that he "has suffered past persecution or has 'a well-founded fear of persecution on account of race,

-8-

religion, nationality, membership in a particular social group, or political opinion.'" *Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005) (alteration and footnote omitted) (quoting 8 U.S.C. § 1101(a)(42)(A)). An alien who has suffered past persecution is "'presumed to have a well-founded fear of persecution on the basis of the original claim,'" although the government may rebut that presumption by showing such "'a fundamental change in circumstances . . . that the applicant no longer has a well-founded fear of persecution.'" *Ba v. Mukasey*, 539 F.3d 1265, 1268 (10th Cir. 2008) (quoting 8 C.F.R. § 1208.13(b)(1)(i)(A)).

## A.  Harassment vs. Persecution

Mr. Nalwamba contends that the BIA mischaracterized his experiences during the Museveni period as mere harassment. He asserts that the abduction, interrogations, and threats against him qualify as persecution. We disagree. "Persecution is the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive and requires more than just restrictions or threats to life and liberty." *Witjaksono v. Holder*, 573 F.3d 968, 976 (10th Cir. 2009) (internal quotation marks omitted). Mr. Nalwamba surely suffered from egregious misconduct, but substantial evidence supports the BIA's conclusion that the misconduct to which he was subjected was more akin to harassment than persecution. His own expert described him as belonging to the category of "public individuals" who "have

been periodically harassed." Admin. R. at 154. And Mr. Nalwamba's testimony depicted incidents that, threatening as they may have been, fell short of the extreme action necessary to establish persecution. Indeed, as the BIA noted, several of Mr. Nalwamba's experiences involved his intervening on behalf of others. Although he was twice detained and interrogated, his detentions were relatively brief and resulted in no physical harm. *Cf. Kapcia v. INS*, 944 F.2d 702, 704–05 (10th Cir. 1991) (finding no past persecution when aliens were harassed, imprisoned, beaten, interrogated, and conscripted into military service). Even the threats against him could be viewed as not so "immediate and menacing" as to constitute persecution. *Vatulev v. Ashcroft*, 354 F.3d 1207, 1210 (10th Cir. 2003). Therefore, given the evidence, we cannot say that every reasonable adjudicator would be compelled to reach a contrary conclusion.

## B. Improved Country Conditions

Mr. Nalwamba also contends that the agency improperly rejected his future-persecution claim on the basis of improved conditions in Uganda since he left. This argument has no merit, however, because Mr. Nalwamba failed to establish the past persecution that would create a rebuttable presumption of future persecution and place the burden on the DHS to prove changed conditions. *See Ba*, 539 F.3d at 1268. Indeed, the BIA's decision makes no mention of changed conditions. To the extent that Mr. Nalwamba is contending that he established, without the benefit of the presumption arising from past persecution, a

-10-

well-founded fear of future persecution, we think that the IJ and BIA reasonably viewed the evidence in rejecting this claim. Thus, Mr. Nalwamba was ineligible for asylum and, consequently, unable to satisfy the more stringent standard for restriction on removal. *See id.* at 1271.

## C. CAT Relief

Finally, Mr. Nalwamba asserts that he was wrongfully denied CAT relief. To obtain protection under the CAT, an alien "must show that 'it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Sarr*, 474 F.3d at 788 (quoting 8 C.F.R. § 1208.16(c)(2)). Citing examples of documented torture, Mr. Nalwamba claims that it is more likely than not that he will be tortured if returned to Uganda. But none of this documentary evidence involves him individually. The BIA reasonably found that he failed to establish entitlement to CAT protection. *See Yuk v. Ashcroft*, 355 F.3d 1222, 1236 (10th Cir. 2004). We therefore reject Mr. Nalwamba's CAT claim.

The petition for review is DISMISSED in part and DENIED in part.

Entered for the Court

Harris L Hartz
Circuit Judge

-11-

08-9587, *Nalwamba v. Holder*

**HENRY**, Chief Judge, concurring.

This case gives me pause.  The Immigration Judge found Rev. Nalwamba's testimony to be credible.  A review of the kind of actions that he faced over many years is chilling, indeed: frequent detentions that were physically and psychologically abusive, some of them at gunpoint; several arrests, the longest lasting four days*;* the hunting down of the Reverend's parishioners as they were thought to be opposed to the regime in power at the time; and frequent government searches.  Under the present regime, he received three "official visits" from government officials in response to his public positions on land ownership.  Maj. Op. at 3.  They warned him not to be a "stumbling block" and apparently criticized him for providing assistance to a pregnant woman and her eight children.  *Id.*  Finally, rather than instruct his congregation to vote for the incumbent Museveni in the 2001 election, the Reverend encouraged his congregation members to make up their own educated minds during the election.  Later that year, government officials forced him from his home at 2 a.m.  He was marched to a "government clinic," where he was interrogated, warned, and finally released.  *Id.* at 4.

Given these acts of terror and harassment, we must determine, whether Rev. Nalwamba was subjected to "persecution" during the Museveni regime, as that term is defined by our precedent.  The dictionary definition of persecution suggests that he was:  For example, the *American Heritage Dictionary* defines to

"persecute" as follows: "1. To oppress or harass with ill-treatment, especially because of race, religion, sexual orientation, or beliefs." *American Heritage Dictionary of The English Language* 1350 (3d ed. 1992). Under that definition, it seems to me, the Reverend's various abductions, detentions, interrogations, and threats against him qualify as persecution.

Our cases do seem to require very violent, pervasive harassment and even injury. Similar cases of harassment that have not resulted in a finding of persecution include: *Sidabutar v. Gonzales*, 503 F.3d 1116, 1118, 1124 (10th Cir. 2007) (concluding that an Indonesian Christian man who had suffered repeated "beatings and robberies at the hands of Muslims" had not established past persecution); *Jian Hui Li v. Keisler*, 248 F. App'x 852, 854 (10th Cir. 2007) (affirming an immigration judge's ruling that, even if true, the deprivation of petitioner's right to education for three months and the broken arm he received during his fight with population control officials "constituted at most harassment and discrimination, but not past persecution within the meaning of the asylum statute"); *Tulengkey v. Gonzales*, 425 F.3d 1277, 1281 (10th Cir. 2005) (affirming immigration judge's decision that robbery of the Chinese Christian petitioner, "during which she was fondled and suffered an unspecified minor head injury, and her witnessing a Muslim mob eight years later steal food and rough up guests at a relative's wedding" was insufficient evidence of past persecution); *Lie v. Ashcroft*, 396 F.3d 530, 536 (3d Cir. 2005) ("[T]wo isolated criminal acts,

perpetrated by unknown assailants, which resulted only in the theft of some personal property and a minor injury, [are] not sufficiently severe to be considered persecution.") (cited with approval in *Tulengkey*, 425 F.3d at 1281); *Eduard v. Ashcroft*, 379 F.3d 182, 188 (5th Cir. 2004) ("denigration, harassment, and threats" did not constitute persecution; nor did "morally reprehensible" discrimination) (internal quotation marks omitted) (cited with approval in *Tulengkey*, 425 F.3d at 1281); *Zhu v. Gonzales,* 465 F.3d 316, 318 (7th Cir. 2006) (affirming an immigration judge's decision that, when family planning commission ordered petitioner's pregnant girlfriend to appear at hospital for forced abortion, when planning officials "kicked and struck [petitioner] with fists in an attempt to bring him to the police station; when he also was hit on the head with a brick, an injury that required seven stitches"; and when "officials asked him to turn himself in after seeking treatment," the petitioner was not subjected to past persecution); *Kapcia v. INS*, 944 F.2d 702, 704-05, 708 (10th Cir. 1991) (concluding that past persecution had not been demonstrated by an asylum applicant who had twice been detained for two-day periods during which he was beaten and interrogated, whose parents' home had been searched, whose work locker had been repeatedly broken into, and who had been assigned poor work tasks, denied bonuses, and conscripted into the army, where he was constantly harassed).

Unlike the *American Heritage* definition, our circuit defines persecution as "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive," and as "requir[ing] more than just restrictions or threats to life and liberty." *Tulengkey*, 425 F.3d at 1280 (quotation omitted). Under our precedent, persecution is "an extreme concept that does not include every sort of treatment our society regards as offensive." *Tanuwidjaja v. Holder*, No. 09-9511, 2009 WL 3645709, at *2 (10th Cir. Nov. 5, 2009) (quoting *Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998) (quotation omitted)); *Guerrero-Hernandez v. Mukasey*, 290 F. App'x 130, 133 (10th Cir. 2008) (same); *Julianto v. Mukasey*, 282 F. App'x 697, 700 (10th Cir. 2008) (same).

Our circuit's narrower definition of persecution still affords considerable latitude to our immigration judges. As the majority clearly points out, our review is for substantial evidence, under which agency findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Maj. Op. at 8. Had I been the hearing judge in this matter, I believe I would have calculated differently. However, based on our deferential standard of review, I concur in the result. *See also Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2004) (describing substantial evidence, in the context of reversal, as "a high standard and one that is properly difficult to meet without powerful and moving evidence").