**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 29, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KELLY CAMILA GONZALEZ
AGUILAR, f/k/a Oscar Alexis
Gonzalez Aguilar,

    Petitioner,

v.

MERRICK B. GARLAND, Attorney
General of the United States,*

    Respondent.

No. 18-9570

_____

**Appeal from the Board of Immigration Appeals**
**(Petition for Review)**
_____

Nicole Henning, Jones Day, Chicago, Illinois (Dennis D'Aquila, Jones
Day, and Keren Zwick and Tania Linares Garcia, National Immigrant
Justice Center, with her on the briefs), on behalf of the Petitioner.

Scott Stewart, Deputy Assistant Attorney General, Civil Division, U.S.
Department of Justice, Washington, D.C. (Joseph H. Hunt, Assistant
Attorney General, Civil Division; Claire L. Workman, Senior Litigation
Counsel; Rosanne M. Perry, Trial Attorney, Office of Immigration
Litigation, Civil Division, with him on the brief), on behalf of the
Respondent.

_____

_____

\*    After oral argument, the Honorable Merrick B. Garland became the
Attorney General of the United States. We thus substitute Attorney General
Garland as the respondent.

Before **BACHARACH**, **PHILLIPS**, and **CARSON**, Circuit Judges.\**

_____

**BACHARACH**, Circuit Judge.

_____

Kelly Gonzalez Aguilar is a transgender woman from Honduras. She came to the United States and applied for asylum, withholding of removal, and deferral of removal. In support, Kelly claimed

- past persecution in Honduras from her uncle's abuse,

- fear of future persecution from pervasive discrimination and violence against transgender women in Honduras, and

- likely torture upon return to Honduras.

The immigration judge denied the applications and ordered removal to Honduras. In denying asylum, the immigration judge found no pattern or practice of persecution. Kelly appealed the denial of each application, and the Board of Immigration Appeals dismissed the appeal. The dismissal led Kelly to petition for judicial review.

We grant the petition. On the asylum claim, any reasonable adjudicator would be compelled to find a pattern or practice of persecution against transgender women in Honduras.

---

\** The Honorable Monroe G. McKay participated on the panel, but he passed away during the pendency of the appeal. The Honorable Gregory A. Phillips replaced Judge McKay on the panel.

## I.    Kelly fled Honduras and sought asylum in the United States.

Kelly was born a male and named "Oscar" at birth.[1] From an early age, however, Oscar displayed many feminine qualities, creating tensions at home. These tensions flared when Oscar's mother left for Mexico. When she left, Oscar went to live with his uncle, a violent man who often beat Oscar and expressed disgust for his feminine behavior. The uncle told Oscar that he was creating "bad luck for the family" and forced him to stop spending time on feminine activities, such as talking to girls and watching soap operas. R. at 106, 217. The uncle cut Oscar's hair and beat him, calling him derogatory names and promising to "make him a man." *Id.* at 106, 218. Oscar's sister intervened, but she too was beaten.

When Oscar was twelve, he and his sister fled to Mexico to look for their mother. But Oscar and his sister suffered further abuse in Mexico, leading them to flee again—this time for the United States. While in the United States, Oscar publicly identified as a woman, changing her name to "Kelly," taking hormonal treatments, and wearing female clothes.

---

[1]    Kelly uses feminine pronouns (she/her), and we use those pronouns for the time that she has publicly identified as a transgender woman.

In describing Kelly during her early years as a boy named Oscar, we mean no disrespect. We do so for clarity: Kelly allegedly suffered because she was viewed as a boy who engaged in feminine activities.

The government brought removal proceedings against Kelly, and she sought asylum, withholding of removal, and deferral of removal. At her hearing, Kelly explained her fear of returning to Honduras, describing life there as "very difficult" for transgender women. *Id.* at 107, 231. The immigration judge found Kelly's testimony credible, but denied asylum, withholding of removal, and deferral of removal. She appealed, and a member of the Board of Immigration Appeals issued a brief order dismissing the appeal. On the asylum claim, the Board rejected Kelly's claims of past persecution and a fear of future persecution.

## II. We review the Board's findings but can consult the immigration judge's opinion.

Though we review the Board's order, we "may consult the [immigration judge]'s opinion to the extent that the [Board] relied upon or incorporated it." *Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007); *see also Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006) ("We also look to the [immigration judge's] decision in . . . cases where the [Board's] reasoning is difficult to discern and the [immigration judge]'s analysis is all that can give substance to the [Board]'s reasoning in its order of affirmance."). We consider the Board's "factual findings [as] conclusive unless any reasonable adjudicator would be compelled to" reach a contrary conclusion. *Dallakoti v. Holder*, 619 F.3d 1264, 1267 (10th Cir. 2010) (quoting *Witjaksono v. Holder*, 573 F.3d 968, 977 (10th Cir. 2009)).

4

**III.    The Board erred in deeming Kelly ineligible for asylum.**

To obtain eligibility for asylum, an applicant must establish status as a refugee. *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004); 8 U.S.C. § 1158(b)(1)(A). An applicant can obtain this status by proving past persecution or a well-founded fear of future persecution. *Wiransane*, 366 F.3d at 893; 8 C.F.R. § 1208.13(b)(1), (2).

**A.    The Board had substantial evidence to deny Kelly's claim of past persecution.**

Kelly argues that the Board should have found past persecution from her uncle's beatings and her expulsion from a Honduran school.

**1.    The Board had substantial evidence to reject Kelly's gender identity as a central reason for her uncle's beatings.**

Kelly argues that her gender identity was a primary reason for her uncle's beatings. The Board disagreed.

To show past persecution, an applicant for asylum must establish membership in a particular social group that is "at least one central reason for" the persecution. 8 U.S.C. § 1158(b)(1)(B)(i); *Dallakoti v. Holder*, 619 F.3d 1264, 1268 (10th Cir. 2010). The reason "cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Id.* (quoting *In re J-B-N- & S-M-*, 24 I. & N. Dec. 208, 214 (BIA 2007)).

The immigration judge found that Kelly's gender identity was not a central reason for her uncle's beatings:

5

> [Kelly] states that her uncle was "physically abusive to my *sister and I*," and that he "would hit *us* with his fists." [R. at 319] (emphasis added). Even though [Kelly's] sister was not a transgender woman, their uncle abused her the same as [Kelly]. This indicates that [Kelly]'s transgender identity was not a "central reason" for her persecution. Instead, the facts suggest other factors—such as the financial burden [she] and her sister placed on their uncle, not to mention the generally brutish character of the uncle—were the central reasons underlying the harm they suffered in Honduras. *See* [*id.* at 320] ("After my mother stopped sending money, my uncle became frustrated and began to physically mistreat us even more.").

R. at 112–13. The Board upheld this finding. *Id.* at 4.

This finding was supported by substantial evidence. Kelly points to evidence of the uncle's slurs and threats, attributing his violence to disgust with Kelly's feminine behavior. But other evidence suggested that the uncle would have abused Kelly anyway: the uncle abused not just Kelly but also her sister and brother, the uncle often resorted to violence when drunk, and the uncle became increasingly violent when he stopped getting money for Kelly's care. A reasonable adjudicator could thus regard gender identity as subordinate or incidental to the uncle's other reasons for beating Kelly. *See Dallakoti*, 619 F.3d at 1268. So we conclude that the Board had substantial evidence to reject Kelly's claim of past persecution based on the uncle's abuse.

> **2.    In appealing to the Board, Kelly did not characterize her expulsion from school as past persecution.**

Kelly also alleges past persecution based on her expulsion from a Honduran school. We can consider this allegation only if Kelly exhausted

6

it when appealing to the Board. *See Torres de la Cruz v. Maurer*, 483 F.3d 1013, 1018 (10th Cir. 2007) (concluding that an issue is exhausted only if it's presented to the Board or otherwise addressed by the Board).

Kelly did not present this theory to the Board, but she did refer to her Honduran education when stating that

- other students had called her "gay" and

- she'd been expelled for refusing to cut her hair or wear male clothing.

R. at 31, 34. Despite these two references to harm at school based on her gender identity, Kelly never characterized the denial of educational access as persecution. So these two references did not present a distinct theory of past persecution involving the denial of education. *See Garcia-Carbajal v. Holder*, 625 F.3d 1233, 1237 (10th Cir. 2010) (Gorsuch, J.) (stating that exhaustion requires the noncitizen to "present the *same specific legal theory* to the [Board of Immigration Appeals] before he or she may advance it in court") (emphasis in original).

\* \* \*

Given the record as a whole, the Board had substantial evidence to find that Kelly had not shown past persecution on account of her gender identity.[2]

---

[2] The Board also concluded that the Honduran government was able and willing to protect children who are lesbian, gay, bisexual, transgender,

B.    **The Board erred in rejecting Kelly's claim based on a fear of future persecution.**

Kelly also claims a well-founded fear of future persecution in Honduras on account of her identity as a transgender woman. The Board rejected this claim, reasoning that Kelly had failed to show a pattern or practice of persecution against transgender adults in Honduras.

1.    **A well-founded fear of future persecution may come from a pattern or practice of persecution.**

To establish a well-founded fear, an applicant must show (1) "a genuine, subjective fear of persecution" that is (2) objectively reasonable based on "'credible, direct, and specific evidence in the record.'" *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004) (quoting *Yuk v. Ashcroft*, 355 F.3d 1222, 1233 (10th Cir. 2004)). For the second element, an applicant must demonstrate a reasonable possibility of future persecution. *Uanreroro v. Gonzales*, 443 F.3d 1197, 1202 (10th Cir. 2006). The possibility can be reasonable even when the chance of future persecution is as low as 10 percent. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987).

Applicants may show that their fears are objectively reasonable based on membership in a group subject to "a pattern or practice" of persecution

---

and intersex. R. at 4. We need not address this conclusion because Kelly's claim of past persecution fails for other reasons.

in the country of removal. *Woldemeskel v. INS*, 257 F.3d 1185, 1190 (10th Cir. 2001); 8 C.F.R. § 1208.13(b)(2)(iii). A pattern or practice exists when the persecution is "systemic or pervasive." *Woldemeskel*, 257 F.3d at 1191 (quoting *Makonnen v. INS*, 44 F.3d 1378, 1383 (8th Cir. 1995)); *In re A-M-*, 23 I. & N. Dec. 737, 741 (BIA 2005).

**2.    The Board found no pattern or practice of persecution.**

In rejecting Kelly's claim of a well-founded fear, the Board upheld the immigration judge's conclusion that Kelly had not demonstrated a pattern or practice of persecution against transgender individuals in Honduras. But the Board supplied no explanation. We can thus "consult[] the [immigration judge]'s more complete explanation." *Sidabutar v. Gonzales*, 503 F.3d 1116, 1123 (10th Cir. 2007); *see* Part II, above.

The immigration judge "recognize[d] that transgender women face hardships in Honduras," but observed that the government had enacted anti-discrimination laws and prosecuted some individuals who had committed crimes against lesbian, gay, bisexual, and transgender individuals. R. at 114. Based on this observation, the immigration judge concluded that transgender individuals did not face "systemic or pervasive persecution." *Id.* (quoting *Woldemeskel*, 257 F.3d at 1191).

**3.     There is pervasive violence against transgender women in Honduras.**

The agency found that Kelly had not shown a pattern or practice of persecution against transgender individuals in Honduras. We disagree. The acts of violence are so widespread that any reasonable adjudicator would find a pattern or practice of persecution against transgender women in Honduras. *See Doe v. Att'y Gen. U.S.*, 956 F.3d 135, 152 (3d Cir. 2020) (concluding that the Board erroneously failed to find a pattern or practice in Ghana of persecution against members of the lesbian, gay, bisexual, transgender, and intersex community); *Bromfield v. Mukasey*, 543 F.3d 1071, 1078 (9th Cir. 2008) (concluding that the Board erroneously failed to find a pattern or practice of persecution against gay men in Jamaica).

The record shows extensive evidence of widespread violence against transgender individuals in Honduras. *See* R. at 264 (2016 State Dep't Report) (stating that "human rights problems" include violence and harassment against Hondurans who are lesbian, gay, bisexual, transgender, and intersex); *id.* at 708 (2015 State Dep't Report) (same); *id.* at 354 (Expert Declaration of Dr. Ubaldo Herrera Coello) ("[Lesbian, gay, bisexual, transgender, and intersex] individuals in Honduras are murdered, attacked, threatened, and intimidated at alarming rates, and often in brutal and/or public ways."); *id.* (Expert Declaration of Dr. Ubaldo Herrera Coello) (stating that "gangs frequently target [lesbian, gay, bisexual,

10

transgender, and intersex] people . . . and subject them to physical and sexual violence, extortion, and forced labor, among other harms"); *id.* at 543 (Inter-American Commission on Human Rights Report) (stating "that killings of [lesbian, gay, bisexual, and transgender] people . . . tend to go unpunished, and that such cases are tainted from the start by discriminatory stereotypes based on victims' sexual orientation or gender identity or expression"); *id.* at 510 (Astraea Lesbian Foundation for Justice Report) ("[Lesbian, gay, bisexual, transgender, and intersex] individuals are particularly vulnerable to violence and death . . . ."); *id.* at 510–11 (Astraea Lesbian Foundation for Justice Report) (stating that between 2009 and 2013, the organization *Cattraches* recorded 120 violent deaths based on gender identity or sexual orientation); *id.* at 423 (translation of *El Espectador* article) (stating that Honduras had the highest rate of crimes against transgender individuals in the Northern Triangle region); *id.* at 467 (*Washington Blade* article) (describing the murder of a Honduran transgender activist and reporting that that "more than 240 people from [Honduras's lesbian, gay, bisexual, transgender, and intersex] community [were] murdered [from] 2008" to 2017).

**4.    Excerpts from the 2016 Country Report do not form a reasonable basis to question the pervasiveness of the persecution.**

The dissent draws on three statements found in the State Department's 2016 Country Report:

11

1.      Lesbian, gay, bisexual, transgender, and intersex groups have continued working with the government to address concerns about intimidation, fear of reprisal, and police corruption.

2.      Honduras has added 30 new agents to investigate violence.

3.      Law-enforcement officials are educating personnel to improve the effectiveness of responses to gender-based violence and violence against transgender persons.

Dissent at 6–7; *see* R. at 297–98. These efforts do not provide a reasonable basis to doubt widespread persecution of transgender women in Honduras.

The dissent cites the 2016 Country Report's discussion of meetings between the government and lesbian, gay, bisexual, transgender, and intersex groups, stating that this discussion suggests "alleviation of the plight of transgender women in Honduras." Dissent at 7. But these meetings confirmed the rampant violence. The cited excerpt states in its entirety:

> The law states that sexual orientation and gender identity characteristics merit special protection from discrimination and includes these characteristics in a hate crimes amendment to the penal code. Nevertheless, social discrimination against [lesbian, gay, bisexual, transgender, and intersex] persons was widespread. As of October the special prosecutor for human rights was investigating nine formal complaints of discrimination by members of the [lesbian, gay, bisexual, transgender, and intersex] community in previous years. Representatives of [nongovernmental organizations] that focused on the right to sexual diversity alleged that the [Military Police for Public Order] and other elements of the security forces harassed and abused members of the community. As of August the [nongovernmental organization] Colectivo Color Rosa reported 11 violent deaths of [lesbian, gay, bisexual, transgender, and intersex] persons, similar to levels in previous years. In October the Public Ministry reported records of 218

cases of violent deaths of [lesbian, gay, bisexual, transgender, and intersex] individuals since 2009, of which 14 cases had resulted in convictions and 171 were still under investigation. [Nongovernmental organizations] also documented multiple instances of assaults and discrimination against members of the [lesbian, gay, bisexual, transgender, and intersex] community.

On June 2, [lesbian, gay, bisexual, transgender, and intersex] activist and community leader Rene Martinez was killed. Martinez was an activist in the ruling National Party, the president of [a lesbian, gay, bisexual, transgender, and intersex] association in San Pedro Sula, the leader of a local community council, and a volunteer with a community-based violence prevention program. As of early August, the [Honduran National Police's Violent Crimes Task Force] continued to investigate the case. It was uncertain whether his death was related to his [lesbian, gay, bisexual, transgender, or intersex] status or political activities.

[Lesbian, gay, bisexual, transgender, and intersex] rights groups asserted that government agencies and private employers engaged in discriminatory hiring practices. [Lesbian, gay, bisexual, transgender, and intersex] groups continued working with the [Honduran National Police's Violent Crimes Task Force], the Ministry of Security, and the Office of the Special Prosecutor for Human Rights to address concerns about intimidation, fear of reprisals, and police corruption.

R. at 297. We do not see how this excerpt regarding meetings could lead an adjudicator to question the widespread nature of persecution against transgender individuals.

The dissent also points to an observation in the 2016 Country Report that the Honduran government enlisted 30 more agents and undertook new educational programs. But the 2016 Country Report acknowledged that

- "[p]ervasive societal violence persisted" despite the governmental efforts and

- "[o]ther serious human rights problems were widespread impunity due to corruption in the investigative, prosecutorial, and judicial systems, and excessive use of force and criminal actions by members of the security forces."

R. at 264. Given the Country Report's assessment of the ongoing and pervasive societal violence—taking place with widespread impunity because of corruption in the Honduran government's investigative, prosecutorial, and judicial systems—we do not see how a factfinder could reasonably question a pattern or practice of persecution based on the assignment of 30 more agents or new educational efforts.

### 5. Anti-discrimination laws in Honduras are ineffective in curbing the pervasive persecution of transgender women.

"The record contains significant evidence that (1) contrary to the Board's finding, *de jure* persecution *does* exist and (2) even if it did not, *de facto* persecution does." *Ali v. U.S. Att'y Gen.*, 931 F.3d 1327, 1335 (11th Cir. 2019) (emphasis in original). Consideration of *de facto* persecution bears heavily on the existence of a pattern or practice. In considering *de facto* persecution, the immigration judge pointed to Honduras's passage of laws designed to prevent discrimination against transgender individuals. R. at 114. But when determining whether the persecution is systemic or pervasive, we must consider the effectiveness of these measures. *See Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1072 (9th Cir. 2017) (en banc) (noting that adjudicators should "consider the difference between a country's enactment of remedial laws and the

14

eradication of persecutory practices, often long ingrained in a country's culture"); *Bromfield v. Mukasey*, 543 F.3d 1071, 1077–78 (9th Cir. 2008) (focusing consideration of a well-founded fear on how the government implements a statute rather than the existence of the statute). In our view, any reasonable adjudicator would have been compelled to regard the anti-discrimination laws inadequate to stem the widespread persecution against transgender women in Honduras.

Despite the continued onslaught against transgender women in Honduras, the dissent points to the country's laws as a basis to deny a pattern or practice of persecution. But the State Department concluded that the Honduran government had been ineffective in enforcing the statutory protections for individuals who are lesbian, gay, bisexual, or transgender. *See* R. at 303 (2016 State Dep't Report) ("The government did not effectively enforce these laws and regulations."); *id.* at 745 (2015 State Dep't Report) (same); *id.* at 739 (2015 State Dep't Report) (stating that there was "an apparent rollback of these protections in the new draft penal code").

The rest of the record echoes this conclusion, confirming the failure of the Honduran government to effectively enforce laws protecting individuals who are lesbian, gay, bisexual, or transgender. *See id.* at 526 (Inter-American Commission on Human Rights Report) (stating that there is "an inadequate judicial response that fuels impunity, corruption, and

15

high levels of poverty and inequality"); *id.* at 514 (Astraea Lesbian

Foundation for Justice Report) ("Holding the judicial system accountable

for enforcing and applying the reformed law remains a major hurdle.").

> **6.** **The Honduran government does not effectively prosecute crimes committed against transgender women.**

The immigration judge pointed not only to the anti-discrimination

laws but also to the Honduran government's prosecution of "individuals

who commit crimes against the [lesbian, gay, bisexual, and transgender]

community." *Id.* at 114. In addressing these prosecutions, the immigration

judge relied on a Country Report from the State Department, which had

reflected "218 cases of violent deaths of [lesbian, gay, bisexual,

transgender, and intersex] individuals since 2009, of which 14 cases had

resulted in convictions and 171 [had remained] under investigation." *Id.* at

297 (2016 State Dep't Report).

But the 2015 Country Report concluded that the infrequent criminal

prosecutions hadn't diminished the abuses of human rights, adding that

these abuses had continued with "widespread impunity":

> The government took some steps to prosecute and punish officials who committed abuses, including arresting and charging members of Congress, judges, prosecutors, mayors and other local authorities, and police officers, but corruption, intimidation, and *the poor functioning of the justice system contributed to widespread impunity*. Civilian authorities arrested and investigated members of security forces alleged to have committed human rights abuses. *Impunity, however, remained a serious problem*, with prosecution in some cases of military and

16

police officials charged with human rights violations moving too slowly or remaining inconclusive.

*Id.* at 708–09 (emphasis added);[3] *see also id.* at 739 (2015 State Dep't Report) (stating "that 92 percent of crimes committed against [lesbian, gay, bisexual, transgender, and intersex] persons were not investigated"); *accord id.* at 544 (Inter-American Commission on Human Rights Report) ("[T]here are few prosecutions or convictions because the national investigation system lacks the necessary tools to recover evidence, and the judicial system does not provide effective protection for witnesses in cases involving violence against [lesbian, gay, bisexual, and transgender] people.").

Indeed, the record overwhelmingly shows that law-enforcement officers are frequently the perpetrators of violence against transgender women. *See id.* at 355 (Expert Declaration of Dr. Ubaldo Herrera Coello)

---

[3]    The dissent quotes the sentence stating that "authorities arrested and investigated members of the security forces alleged to have committed human rights abuses." Dissent at 5. The surrounding sentences provided context. For example, right before this statement, the Country Report said: "The government took some steps to prosecute and punish officials who committed abuses, including arresting and charging members of Congress, judges, prosecutors, mayors and other local authorities, and police officers, *but corruption, intimidation, and the poor functioning of the justice system contributed to widespread impunity*." R. at 708–09 (emphasis added). And right after the statement quoted by the dissent, the Country Report concluded: "*Impunity, however, remained a serious problem*, with prosecution in some cases of military and police officials charged with human rights violations moving too slowly or remaining inconclusive. *Id.* (emphasis added).

("[T]he authorities themselves have directly abused and discriminated against [lesbian, gay, bisexual, transgender, and intersex] communities . . . creat[ing] a widespread perception that the police constitute some of the greatest perpetrators of human rights abuses against [lesbian, gay, bisexual, transgender, and intersex] individuals in Honduras."); *id.* at 535 (Inter-American Commission on Human Rights Report) ("Trans women human rights defenders are also subjected to arbitrary arrest, extortion and threats from police officers."). For example, an international commission observed that Honduran police were using a 2001 statute to arrest transgender women for immodesty, immorality, and disturbance of public tranquility:

> [L]egislation still exists in Honduras, which, in practice, creates situations that violate human rights, in particular to the detriment of transgender people. For example, the 2001 Police and Social Coexistence Act . . . facilitates police abuse and arbitrary detention of transgender people . . . . This law . . . gives police the authority to arrest anyone who "violates modesty, decency and public morals" or who "by their immoral behavior disturbs the tranquility of the neighbors." Thus, it is indicated that transgender people, particularly transgender women, are at risk of being subjected to abuse and arbitrary arrest by the police . . . .

*Id.* at 542–43 (Inter-American Commission on Human Rights Report) (footnotes omitted).

18

**7.     The out-of-circuit opinions cited by the dissent do not address the effectiveness of Honduras's protective measures.**

The dissent points not only to Honduras's fruitless efforts but also to

- two unpublished opinions by the Eleventh and Third Circuits (*Cazares-Zandre v. United States Attorney General*, 791 F. App'x 96 (11th Cir. 2019) (per curiam) (unpublished) and *Martinez-Almendares v. Attorney General*, 724 F. App'x 168 (3d Cir. 2018) (unpublished)) and

- a published Third Circuit opinion (*Gonzalez-Posadas v. Attorney General United States*, 781 F.3d 677 (3d Cir. 2015)).

These opinions provide little guidance.

The dissent relies largely on *Cazares-Zandre v. United States Attorney General*, 791 F. App'x 96 (11th Cir. 2019) (per curiam) (unpublished). But *Cazares-Zandre* didn't address the merits of an asylum claim, which is all we are addressing here. There the Eleventh Circuit addressed an asylum claim, but only as to the applicant's eligibility after a conviction. *Id.* at 101–03; *see* 8 U.S.C. § 1231(b)(3)(B)(ii). The court didn't discuss the merits of the asylum claim, and the word "persecution" never appears in the opinion. *See Cazares-Zandre*, 791 F. App'x at 96–106.

The discussion cited by the dissent instead addressed relief under the Convention Against Torture. *Id.* at 103–04. This distinction matters because the Convention Against Torture heightens the petitioner's evidentiary burden. *See Fuentes-Erazo v. Sessions*, 848 F.3d 847, 852 (8th Cir. 2017) (noting that the Convention Against Torture involves a "generally more onerous standard than that for asylum or withholding of

19

removal") (internal quotations & citation omitted). Because *Cazares-Zandre* involved the Convention Against Torture rather than asylum, the noncitizen had to prove that she would "'more likely than not' be tortured" in Honduras. 791 F. App'x at 103 (quoting 8 C.F.R. § 208.16(c)(2)). But Kelly was seeking asylum, so she needed only to show a reasonable possibility of persecution. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987); *see* Part III(B)(1), above.

The dissent points out that the *Cazares-Zandre* court relied on evidence of measures designed to protect Hondurans who are lesbian, gay, bisexual, and transgender. Despite the existence of those measures, our issue involves their effectiveness rather than the Honduran government's good intentions. *See, e.g.*, *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1072 (9th Cir. 2017) (en banc) (explaining that a disconnect often exists between a country's commitment to protect lesbian, gay, bisexual, transgender, or intersex individuals and the reality of persecution against those individuals). And as the dissent points out, the Eleventh Circuit's unpublished opinion in *Cazares-Zandre* "acknowledged that civilians and government officials in Honduras have subjected [lesbian, gay, bisexual, and transgender] community members to horrible violence." Dissent at 2 n.1 (citing *Cazares-Zandre*, 791 F. App'x at 103–04).

Though the Eleventh Circuit acknowledged horrible violence against individuals who were lesbian, gay, bisexual, or transgender, the narrow

20

issue in *Cazares-Zandre* was whether the petitioner could show a likelihood that she would personally experience torture upon her return to Honduras. *Cazares-Zandre*, 791 F. App'x at 104. Respectfully, we don't think that this opinion bears in a meaningful way on the existence of a pattern or practice of persecution against transgender women in Honduras.

The dissent also relies on the Third Circuit's opinion in *Martinez-Almendares v. Attorney General*, 724 F. App'x 168 (3d Cir. 2018) (unpublished). As the dissent points out, the Third Circuit discussed the "troubling statistic that 92% of crimes against [lesbian, gay, bisexual, and transgender] individuals went unsolved due to inadequate investigation." *Id.* at 172. The court discounted this statistic, reasoning that the petitioner had failed to "compare that statistic to the rate at which crimes against the general population were solved or investigated." *Id.*

This reasoning doesn't relate to the systemic or pervasive nature of the persecution. Unlike the petitioner in *Martinez-Almendares*, Kelly presented evidence that Honduran law-enforcement officers had frequently engaged in the persecution of transgender individuals in Honduras. *See* Part III(B)(6), above. In the face of this frequent persecution, the Third Circuit's reasoning suggests a general impotency of the Honduran government to combat crime.

Finally, the dissent relies on *Gonzalez-Posadas v. Attorney General United States*, 781 F.3d 677 (3d Cir. 2015). There the Third Circuit

21

considered a claim of statutory withholding of removal, not asylum. *Id.* at 680. So the petitioner had to prove that persecution was "more likely than not." *Id.* at 684–88; *see* 8 C.F.R. § 1208.16(b)(2). Here, though, Kelly had to show only that her fear of persecution had been "well-founded." *Cardoza-Fonseca*, 480 U.S. at 431; *see* Part III(B)(1), above.

On top of the difference in issues, the *Gonzalez-Posadas* court pointed only to the existence of measures to investigate crimes, not the effectiveness of those measures. For example, the court relied on the Honduran government's establishment of a special unit to investigate crimes against vulnerable groups as evidence that persecution was not "more likely than not." *Gonzalez-Posadas*, 781 F.3d at 688. We too recognize that Honduras has enacted measures to combat crimes against vulnerable groups, including the transgender community. But the court didn't suggest meaningful help from those measures.

Neither *Gonzalez-Posadas* nor any of the other cited authorities point to any evidence suggesting that Honduras's measures have slowed the widespread persecution of transgender women.

\* \* \*

The record as a whole would have compelled any reasonable adjudicator to find a pattern or practice of persecution against transgender women in Honduras.

22

**IV.    We remand for the Board to reconsider the applications for asylum, withholding of removal, and deferral of removal.**

Kelly applied not only for asylum but also for withholding of removal and deferral of removal. The Board rejected these applications based solely on Kelly's ineligibility for asylum. But we conclude that Kelly is eligible for asylum. So we remand for the Board to reconsider not only the availability of asylum, but also the potential availability of withholding of removal and deferral of removal.

Petition granted.

18-9570, Gonzalez Aguilar v. Garland

**CARSON**, J. concurring in part and dissenting in part

No one can question the suffering Petitioner Kelly Gonzalez Aguilar has experienced over the course of her life.  Her tragic story evokes sympathy for her plight and, while I might decide this case differently than the immigration judge or the BIA, my de novo review of this petition matters not.  Congress mandates that we reverse factual findings *only* when evidence is so compelling that no reasonable factfinder could find as the BIA did—a high bar indeed.  In my opinion, the evidence is not so compelling.  The perhaps unintended result of the majority opinion is a policy victory for certain asylum seekers.  But in my opinion, one we should not award.  That responsibility lies with the other branches of government.

Let me start with where I and the majority agree—that no reversible error exists in the BIA's finding that Petitioner failed to establish past persecution by her uncle based on her transgender identity and that we lack jurisdiction to consider Petitioner's argument that school authorities persecuted her.  I respectfully part ways with the majority when it comes to the question of future persecution.

Having reviewed the entire record, substantial evidence supports the BIA's determination that Petitioner failed to establish a well-founded fear of future persecution.  I cannot agree with the majority that the documentary evidence of conditions in Honduras *compels* the conclusion that Petitioner has a well-founded fear of persecution because of her transgender identity.  Record evidence shows that Honduras has responded to protect LGBT individuals, including enacting a law that

made it a hate crime to discriminate against LGBT individuals, prosecuting those accused of killing LGBT individuals, training its national police force to protect LGBT individuals, and increasing the number of officers on its task force devoted to investigating these crimes. I would posit that's *something* a reasonable jurist could hang her hat on to find that Petitioner does not have a well-founded fear of persecution.

Indeed, the Third Circuit recently affirmed a BIA determination denying asylum to an LGBT individual from Honduras on a similar record. Martinez-Almendares v. Att'y Gen. U.S., 724 F. App'x 168, 172 (3d Cir. 2018) (unpublished). The court noted the points raised by the majority today—that the petitioner submitted evidence showing that Honduras struggles with violence and corruption and has a history of discrimination against LGBT individuals including that ninety-two percent of crimes against LGBT individuals went unsolved. Yet the Third Circuit acknowledged and accepted that the record also contained evidence that Honduras had recently added sexual identity as a protected class under anti-discrimination laws and that the Honduran courts have convicted individuals for crimes targeting LGBT individuals.[1] Id.

---

[1] The Eleventh Circuit recently acknowledged that civilians and government officials in Honduras have subjected LGBT community members to horrible violence. See Cazares-Zandre v. U.S. Att'y Gen., 791 F. App'x 96, 103–04 (11th Cir. 2019) (unpublished) (examining a record for an LGBT individual seeking Convention Against Torture ("CAT") relief from Honduras and noting that the record with similar information did not compel reversal). But just as here, the record showed the government has acted to protect LGBT individuals. Id. In another case, the Third Circuit held that documentary evidence—again mirroring the evidence

Given that other reasonable jurists throughout the country have affirmed similar BIA decisions with similar evidence in the record, how does the majority reach a different result? First, the majority reweighs the evidence, and second, it disregards portions of the State Department's Country Report to suggest the Honduran government is unwilling or unable to protect its citizens.

---

here—did not compel the conclusion that a systematic, pervasive, or organized pattern or practice of persecution of LGBT persons existed in Honduras— undermining the majority's assertion that *any* reasonable adjudicator would have determined that Petitioner had a well-founded fear of future persecution that the Honduran government cannot control. See Gonzalez-Posadas v. Att'y Gen. U.S., 781 F.3d 677, 687–88 (3d. Cir. 2015) (internal quotation marks omitted) (noting record evidence in a withholding of removal case about the Honduran government establishing a special unit to investigate crimes against LGBT persons and other vulnerable groups did not compel the conclusion that a systematic, pervasive, or organized pattern of persecution existed).

The majority believes these citations to Cazares-Zandre and Gonzalez-Posadas are inapplicable because those cases involved a different burden on the petitioner from this case. True enough. But the courts in those cases viewed a record the majority today says a reasonable adjudicator could not view as showing Honduras willing and able to protect LGBT individuals. Specifically, the records indicated Honduras took recent action to protect LGBT individuals by enacting hate crime laws, prosecuting perpetrators accused of killing LGBT individuals, training national police force members to protect the LGBT community and increasing the number of officers to investigate LGBT crimes. And those courts concluded this evidence did not compel a conclusion that a pattern or practice of persecution or a likelihood of torture of LGBT persons occurs in Honduras. See Gonzalez-Posadas, 781 F.3d at 688 (concluding that the evidence did not compel the conclusion that petitioner was more likely than not to suffer persecution on account of his sexual orientation in light of the Honduran government establishing a special unit in the attorney general's office to investigate crimes against LGBT persons and other vulnerable groups and that the record did not "compel the conclusion that there is a 'systematic, pervasive, or organized' pattern or practice of persecution of LGBT persons in Honduras"); Cazares-Zandre, 791 F. App'x at 103–04 (stating that the record did not compel a finding that the petitioner was more likely than not to be tortured by or with the acquiescence of a government official if deported to Honduras despite record evidence that both civilians and government officials had subjected members of the LGBT community in Honduras to horrible violence).

3

When the majority claims that the BIA disregarded uncontradicted evidence that transgender women in Honduras continue to face persecution despite government protections, it misreads the record and, as a result, reweighs the evidence. Undisputedly the record contains evidence showing violence against transgender women in Honduras. But the immigration judge acknowledged the evidence that transgender women face "widespread social discrimination" and are "among the most vulnerable to violence in Honduras." At the same time, the immigration judge considered the number of investigations into crimes against LGBT individuals and the resulting number of prosecutions. Although the immigration judge noted that the Honduran government was not able to successfully prosecute all perpetrators of crimes against the LGBT community, the immigration judge nevertheless found that "the legislative efforts to ensure LGBT rights—including protections for transgender women—reveal that there is 'not systemic or pervasive persecution' of transgender individuals in Honduras." And that finding does not contradict other decisions.

The majority also contends that the documentary evidence—including the Country Report—"overwhelmingly" points to the Honduran government's inability to prevent widespread discrimination against transgender women—a novel conclusion, but one it must make to overturn the BIA. See Martinez-Almendares, 724 F. App'x at 172. The Eleventh Circuit has said that the Honduras "Country Report taken as a whole provides substantial evidence to support the BIA and IJ's finding that there is no pattern or practice of persecution of LGBT persons in

4

Honduras."[2] Euceda v. U.S. Att'y Gen., 491 F. App'x 163, 166 (11th Cir. 2012) (unpublished). The majority quotes snippets of both the 2015 and 2016 Honduras Country Reports but disregards the reports as a whole. Undisputedly, the Country Reports mention that transgendered individuals face violence and harassment. But the Country Reports also explain that the Honduran government "took steps to prosecute and punish officials who committed abuses, including arresting and prosecuting members of congress, judges, prosecutors, police officers, mayors, and other local authorities." The Reports also mention that "authorities arrested and investigated members of the security forces alleged to have committed human rights abuses." True, some prosecutions moved slowly or failed to lead to a conviction. But the majority disregards evidence of the Honduran government's willingness and ability to protect its citizens.

In addressing the dissent, the majority appears to acknowledge the evidence that the Honduran National Police has assigned 30 new agents to the violent crime

---

[2] Again, the majority takes issue with the fact that Euceda required the petitioner bear a different burden than the burden here. Regardless of that fact, the Eleventh Circuit concluded that the Honduras Country Report provided substantial evidence of no pattern or practice of persecution of LGBT persons in Honduras. The majority also contends that the 2010 report relied on in Euceda may or may not resemble the 2015 and 2016 Country Reports in evidence in this case. True, we do not have the 2010 Country Report before us. But the Eleventh Circuit stated that the 2010 report provided specific examples showing that the government has prosecuted both police officers and private persons who committed acts of violence against the LGBT community. Euceda, 491 F. App'x at 166. The 2015 and 2016 reports go even further in stating that Honduras prosecuted and punished members of congress, judges, prosecutors, police officers, mayors, and other local authorities. Prosecution and punishment suggest both a willingness and an ability to control persecution.

task force, which is investigating homicides of members of the LGBTI community; and taken steps to educate personnel to respond more effectively to cases of gender-based violence and violence against LGBTI persons.  But rather than view the record with an eye towards examining whether reasonable, substantial, and probative evidence supports the factual determinations, the majority dismisses the evidence only to state that the record suggests that the Honduran government's efforts have not made a difference.  In its opinion, these efforts just aren't weighty enough and that no reasonable adjudicator could view the evidence in the record as the immigration judge, BIA, Third Circuit, or I have.[3]  I would suggest the majority look to the evidence in the Country Report that Honduras is prosecuting its judges, politicians, and security forces that engage in human rights violations.  See Rojas v. I.N.S., 937 F.2d 186, 190 n.1 (5th Cir. 1991) (noting that the United States Department of State is "the most appropriate and perhaps the best resource the [BIA] could look to in order to obtain information on political situations in foreign nations"); see also Reyes-Sanchez, 369 F.3d 1239, 1243 (11th Cir. 2004) (concluding the immigration judge and the BIA could "rely heavily on" the State Department's country report).  In

---

[3] The Third Circuit's opinion demonstrates that reasonable jurists could debate whether the evidence in the record supports the factual determinations.  See Wilson v. Sec'y Pa. Dep't of Corr., 782 F.3d 110, 115 (3d Cir. 2015) (holding that a conflicting decision from another circuit "demonstrates that the issue [the petitioner] presents is debatable among jurists of reason" (internal quotation marks omitted)); see also United States v. Crooks, 769 F. App'x 569, 572 (10th Cir. 2019) (unpublished) (citing cases for the proposition that where another circuit opposes our view, the issue is debatable).

response, the majority cites to pages 303 and 745 of the record to argue that the State Department has described prosecutions as few and ineffective. Those sections of the 2015 and 2016 Country Report discuss "Worker Rights," and in particular, discrimination with respect to employment and occupation. More relevant to the case before us are pages 297 and 298 of the 2016 Country Report, which discuss "Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation." That section of the report acknowledges that LGBTI groups assert that government agencies and private employers engage in discriminatory hiring practices, but that LGBTI groups "continued working with the VCTF, the Ministry of Security, and the Office of the Special Prosecutor for Human Rights to address concerns about intimidation, fear of reprisals, and police corruption." That section also mentions thirty new agents to investigate such violence. Additionally, the section mentions the work law enforcement took to educate personnel to respond *more effectively* to cases of gender-based violence and violence against LGBTI persons. Again, this evidence suggests alleviation of the plight of transgender women in Honduras.

I agree with the BIA that the record does not *compel* the conclusion that a systematic, pervasive, or organized pattern or practice of persecution of LGBT persons exists in Honduras. No doubt a person could view the record before us differently—the majority does so today—and I might on de novo review. To be sure, the record contains evidence showing that Honduras could do better in its enforcement of its laws, but that does not mean we may disregard the evidence the immigration judge considered in reaching its conclusion. Indeed, we must uphold the

7

BIA's decision when substantial evidence supports it. Escobar-Hernandez, 940 F.3d at 1361. And "reasonable, substantial and probative evidence" supports the BIA's conclusion that the Honduran government protects transgender women and that those women do not face a pattern or practice of persecution by the government or others the government is unwilling or unable to control. "It is not our prerogative to reweigh the evidence, but only to decide if substantial evidence supports the [immigration judge's] decision." Yuk v. Ashcroft, 355 F.3d 1222, 1236 (10th Cir. 2004). Because I cannot say that any reasonable adjudicator would be compelled to reject the immigration judge's findings, I respectfully dissent and would deny Petitioner's petition for review and dissolve the stay on removal entered by this Court on December 17, 2018.