In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-2909

MELVIN JAVIER OSORIO-MORALES,

*Petitioner*,

*v.*

MERRICK B. GARLAND,
Attorney General of the United States,

*Respondent*.

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A206-796-531

ARGUED APRIL 11, 2023 — DECIDED JULY 5, 2023

Before SCUDDER, ST. EVE, and LEE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. In 2014, Petitioner Melvin Osorio-Morales fled his home in Honduras for the United States, fearing that he would be the next victim in a decades-long, murderous feud between his family and the Hernandez family. When the United States found that Melvin was here illegally in 2015, it initiated removal proceedings. Based on the threat to his life from the feud, he sought asylum relief, withholding

of removal, and protection under the Convention Against Torture. But because the feud was not sanctioned by the Honduran government, the Immigration Judge ("IJ") denied his requests for relief and the Board of Immigration Appeals ("BIA") affirmed. Osorio-Morales now appeals.

## I. Background

### A. Facts

Sometime in 1996, Melvin Osorio-Morales's family member, Jeremias Osorio Morales, was dating a woman named Marisena Argueta. Argueta was also dating a member of the Hernandez family, Giovani Hernandez Maldonado. The two men ended up in a shootout over Argueta and Jeremias was killed. Angered by Jeremias's death, the Osorio family killed Giovani's relative, Robert Hernandez.

At the end of that year, the Hernandez family responded, setting fire to the Osorio family home. The fire burned Melvin's grandmother alive. His father escaped by hiding under a car outside while the house burned. Two uncles, who had been in the house, escaped with significant burn injuries. According to one uncle, although a criminal case was brought after the fire, the accused members of the Hernandez family were subsequently released.[1] So began a decades-long, bloody feud between the Osorio and Hernandez families. Melvin was born under the shadow of this violence just one year later.

---

[1] Nothing in the record indicates who initiated this investigation or prosecution. In fact, Melvin specifically stated that he does not know if any of his relatives ever filed police reports about the violence from the Hernandez family, including this fire.

While Melvin himself has never had a violent interaction with the Hernandez family, the conflict continued throughout his life, always requiring him to "watch [his] back." At his hearing, Melvin described more than fifteen years of hostility that took a massive toll on his family: his cousin Luis was left paralyzed, Luis's father and two of Melvin's uncles were killed, two of Melvin's cousins committed suicide out of fear of what the Hernandez family would do to them, and another cousin was stabbed to death.[2]

Although he contends that "everybody knew who" was responsible for these murders, Melvin does not believe that anyone in his family ever filed a police report about the violence. Fearing that he would be next, Melvin came to the United States in 2014. He left behind "a lot of family" in Honduras; he believes that they "live in a state of chaos" because of the feud and always need to carry weapons for protection.

**B. Procedural History**

On June 10, 2019, Melvin had a hearing before the IJ, where he testified to the above facts as part of his applications for asylum and withholding of removal.[3] Although the IJ found him credible, he nevertheless denied Melvin's petition on two separate grounds: (1) Melvin could not show a likelihood of persecution and (2) he could not show that the

---

[2] Melvin also noted that one of his uncles was killed in an altercation with police in 2014. He does not allege, however, that this killing was related to the feud.

[3] Melvin also applied for relief under the Convention Against Torture, which the IJ denied. Because he does not appeal this decision, we do not discuss it here.

Honduran government was unwilling or unable to protect
him from the interfamily violence.

The IJ concluded that Melvin could not show a well-
founded fear of persecution, as required for both asylum and
withholding of removal. The IJ conducted this analysis in
three parts, asking whether Melvin had been subject to past
persecution; whether he had an objectively reasonable fear of
future persecution; and whether there was a pervasive pattern
or practice of persecution against Melvin's family in Hondu-
ras that would otherwise make persecution reasonably likely.
First, because Melvin himself was never threatened or at-
tacked, the IJ determined that his treatment simply was not
severe enough to establish past persecution. Relying on this
Court's opinion in *N.L.A. v. Holder*, 744 F.3d 425 (7th Cir.
2014), the IJ further held that it could not "consider [Melvin's]
family's past harm as part of his harm because it was not di-
rected at him." Because Melvin had not established past per-
secution, the IJ turned to the question of future persecution.
Although the IJ found that Melvin's subjective fear of perse-
cution at the hands of the Hernandez family was reasonable,
he found no objectively reasonable possibility of persecution
for Melvin in Honduras. The IJ noted that Melvin himself was
able to live in Honduras until the age of sixteen—in the same
town where most of the violence occurred—without ever per-
sonally being threatened or attacked. He also pointed out that
Melvin's Osorio relatives still live there and have not been
harmed by the Hernandez family since 2010. Accordingly, the
IJ decided that there was no well-founded fear of future per-
secution. Nor did the IJ believe there was a clear pattern or
practice of persecution against members of the Osorio family.
Because Melvin's family members had lived in relative safety
since 2010, the IJ held that the violence was not "extreme"

enough to meet this Circuit's standard for a "pattern or prac-
tice" of persecution.

Finally, persecution analysis aside, the IJ held that Melvin
had failed to show that the Honduran government was una-
ble or unwilling to protect him and his family from this vio-
lence. The IJ pointed to the police involvement and subse-
quent prosecution of two members of the Hernandez family
after the fire that killed Melvin's grandmother as evidence
that the Honduran government would be willing to take some
action to protect the Osorio family. Taken with the fact that
the Osorio family did not report any of the other violence to
the police, the IJ held that Melvin had not shown a lack of
government willingness to help. The IJ explained: "While the
Honduran government may struggle with policing crime and
violence, this factor in and of itself cannot establish that the
government is unable or unwilling to protect the [Osorio fam-
ily]."

Melvin subsequently appealed to the BIA, which affirmed
the IJ's decision. It began by noting that the IJ's holding that
the Honduran government was not "unable or unwilling" to
protect Melvin from the violence of the Hernandez family
was, alone, a sufficient reason to deny the asylum application.
The BIA went on to affirm the IJ's holding that Melvin's expe-
riences in Honduras did not amount to past persecution or a
reasonable fear of future persecution. This appeal followed.

## II. Analysis

Because the BIA adopted the view of the IJ and affirmed
with additional analysis, we review both opinions, affirming
if they are supported by substantial evidence. *Minghai Tian v.
Holder*, 745 F.3d 822, 826 (7th Cir. 2014). This is not a high bar.

Indeed, "we may reverse the IJ's determinations only if we determine that the evidence *compels* a different result." *Rama v. Holder*, 607 F.3d 461, 465 (7th Cir. 2010) (emphasis added).

## A. Asylum Standards

"To receive asylum, [the applicant] bears the burden of proving that he is a 'refugee' within the meaning of the Immigration and Nationality Act ('INA')." *Vahora v. Holder*, 707 F.3d 904, 907 (7th Cir. 2013). This means that an applicant "must 'demonstrate that []he is unable or unwilling to return to the country of h[is] nationality because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Dai v. Garland*, 24 F.4th 628, 634 (7th Cir. 2022) (cleaned up). But "'persecution' under the INA does not encompass purely private actions. … Rather, to receive protection under the statute, the persecution must be inflicted by the government, or by private actors whom the government is unable or unwilling to control." [4] *Vahora*, 707 F.3d at 908 (quoting *Jonaitiene v. Holder*, 660 F.3d 267, 270 (7th Cir. 2011) and *Escobar v. Holder*, 657 F.3d 537, 543 (7th Cir. 2011)).

---

[4] Melvin challenges the IJ's and BIA's conclusions on both his asylum claim and his withholding of removal claim. But the requirements to prove a right to either asylum or withholding of removal are similar. In comparing the two standards, we have repeatedly explained that the difference is an applicant's burden of proof. An "asylum claim[ant] ha[s] the lowest burden of proof, so [the] failure to establish eligibility for asylum necessarily means that [the applicant] cannot prevail on [a] withholding of removal … claim[]." *N.Y.C.C. v. Barr*, 930 F.3d 884, 890 (7th Cir. 2019). Because Melvin's asylum claim is dispositive as to his withholding of removal claim, we analyze only the asylum claim here.

Here, Melvin claims persecution by private actors—the Hernandez family. Accordingly, he bears the burden of showing that the Honduran government is unable or unwilling to protect him from the threat that the Hernandez family poses. The IJ concluded, and the BIA affirmed, that the Honduran government is not "unable or unwilling" to control the threat from the Hernandez family.[5] Because that decision is supported by substantial evidence, we now affirm.

## B. "Unable or Unwilling" Standard

We have upheld rulings that a government is not "unable or unwilling" to protect victims from persecution where the record reflects that the government has taken some steps (even imperfect ones) toward protecting victims. In *Bitsin v. Holder*, for example, we considered persecution claims from Bitsin, a man who feared retribution in Bulgaria by two men against whom his father had testified in a criminal trial. Bitsin's father had received threats because of his testimony and was placed in protective custody; two other trial witnesses were physically harmed; and the son of a reporter who investigated the two men on trial had been attacked. 719 F.3d 619, 629 (7th Cir. 2013). Nevertheless, we refused to disturb

---

[5] Melvin argues that "[t]he [IJ] only decided the [question of the Honduran government's willingness or ability to protect] as to future persecution," and not as to Melvin's past persecution argument. But a review of the IJ's opinion belies this argument. In fact, all evidence referenced by the IJ on the issue of government protection—a police investigation into Osorio-Morales's grandmother's death, the resulting arrests, and Osorio-Morales's family's own failure to report the subsequent violence—occurred contemporaneously with the alleged past persecution. Accordingly, we read the IJ's conclusion as applying to both past and future persecution.

the BIA's denial of asylum, concluding that the government was neither unable nor unwilling to protect Bitsin from private threats. In particular, we found relevant that Bitsin himself had not been threatened, the Bulgarian government had taken reasonable steps to investigate and punish those responsible for the threats, and the government had offered witness protection services to Bitsin's father. *Id.* at 630. *See also Chetri v. Lynch*, 633 F. App'x 336, 340 (7th Cir. 2015) (government is not "unable or unwilling" to protect victims if, "when prodded, the police do take action").

We have also found it reasonable—even in cases of extreme violence—to expect asylum seekers to have sought help from the authorities before concluding that their country is "unable or unwilling" to protect them. In *Vahora v. Holder*, we heard the case of a Muslim man who claimed that two Hindu leaders in India had murdered his friends and attempted to murder him as well, telling them all that India "was meant for Hindus and not for Muslims." 707 F.3d at 906. One of the assailants threatened him with a gun to keep him quiet about the attempted murder. *Id.* at 906–07. Despite two moves within India, the two assailants repeatedly found him and assaulted him. *Id.* at 907. The BIA, considering Vahora's case, held that the Indian government was not "unable or unwilling" to protect him from these two assailants. It relied on a State Department report reflecting efforts by the Indian government to punish perpetrators of religious violence and the fact that Vahora did not seek help from the police after any of his alleged attacks. *Id.* at 909. Based on this evidence, we decided that the BIA's conclusion that the Indian government was willing and able to protect Vahora from any potential religious persecution was supported by substantial evidence.

Finally, we often require evidence of systemic, rather than individual, failures to prove that a government is "unwilling or unable" to protect its people. "Although police apathy can indicate a government's unwillingness or inability to protect an applicant," a one-off conversation with an unhelpful officer does not necessarily show that a government is "unable or unwilling" to protect a victim. *Id.* at 910. Similarly, a government's decision not to prosecute, without more information about *why* that decision was made, does not itself show an "unwillingness or inability to protect." *See Jonaitiene*, 660 F.3d at 271.

## C. Willingness of the Honduran Government

Melvin believes the Honduran Government is "unable or unwilling" to protect him from the Hernandez family. He first points to the investigation into the fire that killed his grandmother, arguing that the release of the suspects in that case shows an unwillingness or inability to help his family. But that is not how the IJ saw it—the IJ noted that, "[t]hough the outcome was not favorable to [Melvin's] family, the government took some action in investigating the case," which suggested that Honduras *was* willing to protect his family from the Hernandezes. Melvin insists that this was the "wrong inference." The question is not whether the inference was "wrong," however, but rather whether the evidence *compels* a different result. That simply is not the case here. It was reasonable for the IJ to infer that an investigation into private violence suggests willingness by the Honduran government to protect its citizens from such violence. *See Bitsin*, 719 F.3d at 629; *Chetri*, 633 F. App'x at 340. And as in *Jonaitiene*, there is no evidence explaining *why* the Hernandez family members who allegedly killed Melvin's grandmother were released. If

we do not even know whether the government "was presented with sufficient evidence" to convict the Hernandez defendants, "but chose not to do so," *Jonaitiene*, 660 F.3d at 271, then the evidence does not compel the reversal of the IJ's finding that the government was not "unable or unwilling" to protect the Osorios.

Melvin also testified that "[t]he police know about [the Hernandez family], and they know about their involvement," "but no one is willing to do anything about it." But as the IJ noted, there is no evidence that anyone in Melvin's family reported any of the violence to the police, so there is no way to know how the police would have reacted or whether the government would have helped. *See Vahora*, 707 F.3d at 909. This means Melvin has failed to carry his burden.

We do not intend to downplay the gravity of Melvin's situation. He has spent his entire life under the threat of a violent dispute that he neither started nor encouraged. But no matter how sympathetic his case, our law does not permit us to grant asylum where an IJ has reasonably found that a foreign government is willing and able to help the asylum-seeker. Because Melvin failed to show that the Honduran government was "unable or unwilling" to protect him, his claims must fail. His petition for review is therefore

DENIED.