FILED
United States Court of Appeals
Tenth Circuit

March 11, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

AMARJEET SINGH,

    Petitioner,

v.

PAMELA J. BONDI, United States
Attorney General,[*]

    Respondent.

No. 23-9589

_____

**Petition for Review from an Order of the
Board of Immigration Appeals**

_____

Saad Ahmad of Saad Ahmad & Associates, Fremont, California, for Petitioner.

Corey L. Farrell (Nancy D. Pham, Trial Attorney, and Sabatino F. Leo, Assistant Director, on the brief), U.S. Department of Justice, Office of Immigration Litigation, Washington, D.C., for Respondent.

_____

Before **MATHESON**, **PHILLIPS**, and **McHUGH**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

[*]On February 5, 2025, Pamela J. Bondi became Attorney General of the United States. Consequently, her name has been substituted for Merrick B. Garland as Respondent, per Fed. R. App. P. 43(c)(2).

Amarjeet Singh, a native and citizen of India, petitions for review of the Board of Immigration Appeals's decision affirming an immigration judge's decision denying him asylum relief. Singh contends that the Board misinterpreted the unable-or-unwilling standard that applies to asylum claims alleging private persecution. He also contends that his evidence compels the finding that the Indian government had been unable or unwilling to protect him from past persecution committed by political rivals. Exercising our jurisdiction under 8 U.S.C. § 1252(a), we deny the petition because the Board did not misinterpret the unable-or-unwilling standard and its factfinding satisfies the substantial-evidence standard.

## BACKGROUND

### I.    Immigration Legal Background

Under federal immigration law, noncitizens who enter the United States without valid documentation are inadmissible and removable from the United States.[1] 8 U.S.C. §§ 1182(a)(7)(A)(i), 1229a(e)(2)(A). The removal process involves three levels of review: an evidentiary hearing before an immigration judge (IJ), an appeal to the Board, and review in a federal court of appeals. During removal proceedings before an IJ, a noncitizen may apply for asylum

---

[1] We use the term "noncitizen" as equivalent to the statutory term "alien." *See* 8 U.S.C. § 1101(a)(3); *Nasrallah v. Barr*, 590 U.S. 573, 578 n.2 (2020) (using "noncitizen").

under the Immigration and Nationality Act (INA), seeking refugee status and protection from removal. *See id.* §§ 1158, 1101(a)(42).

If the IJ determines that a noncitizen is ineligible for asylum and orders removal, the noncitizen may appeal to the Board. *Id.* § 1158(d)(5)(A)(iv). If the Board affirms that the noncitizen is ineligible for asylum and affirms the IJ's order of removal, the noncitizen may obtain judicial review in a federal court of appeals. *Id.* § 1252(a). That process brought Singh's petition to this court.

## II.    Administrative Record

In 2017, Singh, a native and citizen of India, fled that country. He paid a smuggler $15,000 to transport him to the United States, which he entered via Mexico, without inspection or admission. He made it about twenty yards past the international boundary before a border-patrol agent stopped and arrested him. When he applied for admission, he did not possess a valid entry or travel document. That led the government to commence removal proceedings against him. *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I). In early 2018, Singh appeared in immigration court. There, he conceded his removability.

Though removable, Singh applied for asylum and withholding-of-removal relief under the INA.[2] 8 U.S.C. § 1158; *id.* § 1231(b)(3). Before the IJ, he

---

[2] Singh also applied for protection under the regulations implementing the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 (CAT). 8 C.F.R. §§ 1208.16, 1208.18. The Board affirmed the IJ's denial of CAT relief, and Singh has not petitioned for us to review that decision.

3

contended that he qualified for asylum protection as a refugee because the
Indian government had failed and would fail to protect him from persecution.[3]
In support, he testified with help from an interpreter and presented
documentary evidence, including country-conditions reports, judicial records,
and signed statements from himself, his brother-in-law, a doctor, and a political
ally. His evidence falls into three groups: (A) his life and India's conditions,
(B) a 2000 incident in which Indian police wrongly arrested and tortured him,
and (C) two 2017 incidents in which political-opposition members assaulted
him.

### A.    Singh's Background & India's Conditions

India is a country of almost 1.4 billion people with twenty-nine states and
a parliamentary democracy. Since 2014, the Hindu Bharatiya Janata Party (BJP)
has led the government. A 2017 report from the United States Department of
State notes that though India criminalizes corruption and has held officials
"accountable for illegal actions," AR at 287, officials often engage in "corrupt
practices with impunity," *id.* at 312. According to the report, a "lack of
accountability for misconduct" infects "all levels of government." *Id.* at 279.
Police are "overworked, underpaid, and subjected to political pressure," which
contributes to corruption. *Id.* at 287. The report notes that the "most significant

---

[3] Singh appeared before Utah-based Immigration Judge Christopher M.
Greer. Venue in the Tenth Circuit is proper because the administrative
proceedings were completed in Utah. 8 U.S.C. § 1252(b)(2).

human rights issues included police and security force abuses, such as extrajudicial killings, disappearance, torture, arbitrary arrest and detention, rape, harsh and life-threatening prison conditions, and lengthy pretrial detention." *Id.* at 279.

Singh was born and raised in Patiala, a city in the Indian state of Punjab. He is Sikh and a member of the Sikh nationalist "Shiromani Akali Dal, Amritsar" (Mann) party, which advocates for Sikh separatism from India. *Id.* at 197. The Punjab and Haryana High Court has held that demanding Sikh independence is not a crime. Despite that legal protection, a 2018 report from the United Nations Refugee Agency recounts uncorroborated allegations of mistreatment toward Mann advocates, including cases of "temporary arrests" that sound in "political persecution." *Id.* at 246.

The Mann party is the minority Sikh party in Punjab. The more moderate, mainstream Sikh party is the Akali-Dal-Badal (Badal) party. According to the United Nations report, the Badal and Mann parties are often in conflict. Though the parties have no "armed militias," their activist members sometimes "act like militias" by disrupting the opposing parties' political events, leading to physical violence and arrests. *Id.* (internal quotation marks omitted). The conflict between these political parties, and Singh's status as a Sikh and Mann party member, set the backdrop for the events that gave rise to Singh's alleged persecution in India.

**B.    Wrongful Arrest in 2000**

Before the IJ, Singh testified about his wrongful arrest and torture by police. In July 2000, Badal members tried to recruit Singh. When he rebuffed them, they attacked him. After the attack, he went to the police station. But the police officers, who Singh says acted for the Badal party, refused to take Singh's report. Instead, they threatened to fabricate a criminal case against him if he pursued the matter. Singh left the police station.

About ten days later, police officers arrested Singh on the pretext that he unlawfully possessed a revolver and ammunition. They took Singh to the Sadar police station, where they stripped him naked, forced him to lie down, and pulled his legs apart. They held him at the police station for three days, charged him with unlawfully possessing a firearm, and jailed him for two days before releasing him on bail.

Weeks later, the Patiala Vigilance Bureau arrested the police inspector who led Singh's arrest. In August 2000, Punjabi authorities charged the inspector and the station's sub-inspector with corruption unrelated to Singh's arrest. Meanwhile, Singh hired an attorney and fought the firearm charge in court. Though he challenged the charge on its merits, he did not report that the police had abused him. In 2003, an Indian judge acquitted Singh, concluding that the police had framed him.

After that, Singh left Patiala for other parts of India. He did not return for four years because he feared the police. In 2008, he briefly went back home.

6

But after learning that the police were looking for him, he left again for a nearby town. All told, he was away for seven years—living in several places. Fearing arrest, he halted his political activity. In 2015, he returned to Patiala, where he resumed his advocacy for the Mann party. A few months later, police came to his residence while he was not home. The police left without telling Singh's family why they were looking for him. The visit scared Singh and he left Patiala for a nearby town.

### C.     Assaults in 2017

Singh also gave evidence about two assaults in 2017, which drove him to flee India. On February 2, 2017, Badal and BJP members attacked Singh as he was walking home from a Mann event. They beat him with their fists and feet. Passersby interrupted the attack, causing the assailants to flee. Singh did not report the attack because he feared the police.

Six months later, in August, Singh was attacked again. While walking on the street, opposition political-party members rushed him with hockey sticks, shouting, "There's Amarjeet!" and beat him with the sticks. *Id.* at 198. He was knocked unconscious and later found by passersby, who called for help.

Singh's father took him to the police station to report the attack. But Singh says that the police paid him "no heed." *Id.* at 198. The police told him to come back the next day to report the incident and then "kicked" him out. *Id.* at 150, 198. Singh did not return to the police station because the police had

7

"disrespected" him. *Id.* at 150. Further, he feared wrongful arrest. So he paid a smuggler to transport him to the United States.

### III.    Administrative Outcome & Petition

The IJ ruled on Singh's asylum application on June 24, 2019. Though the IJ credited Singh's testimony, the IJ found that Singh was ineligible for asylum under the INA because he had not shown past persecution or a well-founded fear of future persecution. So the IJ denied Singh's application for asylum and withholding of removal. At the same time, the IJ ordered that Singh "be removed from the United States to India." *Id.* at 56.

Singh timely appealed the IJ's INA decisions to the Board. Four years later, the Board—acting through a single appellate immigration judge— dismissed Singh's appeal. *See* 8 C.F.R. § 1003.1(e)(5) (empowering a single member of the Board to resolve certain appeals in "a brief order"). In its decision, the Board affirmed the IJ's denial of asylum relief. It concluded that Singh "did not establish that the past harm suffered or the future harm that he fears in India was or would be inflicted by the Indian government or by individuals or groups that the Indian government is unable or unwilling to control." AR at 4. In support of that finding, the Board emphasized that Singh had been cleared of the false criminal charge from 2000, that he did not report the 2017 attacks, that he failed to support his claim that the police would not have taken his reports in 2017, and that Singh's country reports did not support Singh's contentions regarding the level of violence in India. *Id.* And because

8

the Board concluded that Singh had "not met the burden of proof for asylum," Singh could not meet the more-stringent burden for "withholding of removal under the INA." *Id.* at 5. The Board having dismissed the appeal, the IJ's removal order became final. 8 C.F.R. § 1241.1(a).

After the Board's dismissal, Singh filed this timely petition for review. He also moved to stay the final removal order, but we denied that request. Without a stay, the government can remove him to India at any time. 8 U.S.C. § 1231(a)(1)(B)(ii). To our knowledge, the government has not removed Singh.

Singh's petition challenges the Board's dismissal of his asylum claim.[4] He contends that the Board misinterpreted the unable-or-unwilling standard for claims alleging private (nongovernmental) persecution. He also contends that the Board erroneously concluded that he had failed to prove that India was unable or unwilling to protect him from past persecution at the hands of private actors. *See* Pet. Br. at 2 ("[T]he bone of contention is whether [] Singh suffered past persecution in India at the hands of forces the Indian government was unable or unwilling to control.").

---

[4] The government asserts that Singh waived his claim for withholding-of-removal relief under the INA by contesting only his asylum claim. We do not address whether Singh preserved his withholding claim, because we deny review of his petition's asylum claim, which dooms his withholding claim. *See Uanreroro v. Gonzales*, 443 F.3d 1197, 1202 (10th Cir. 2006) ("Applicants who cannot establish a well-founded fear under asylum standards will necessarily fail to meet the higher burden of proof required for withholding of removal under the INA or Convention Against Torture.").

## DISCUSSION

The discussion (I) gives the relevant legal framework and (II) analyzes Singh's arguments within that context.

## I.   Legal Framework

"Immigration law can be complex, and it is a legal specialty of its own." *Padilla v. Kentucky*, 559 U.S. 356, 369 (2010). Singh seeks judicial review of the Board's determination that he is ineligible for asylum because he failed to prove that he was persecuted by private actors that the Indian government was either unable or unwilling to control. To help understand Singh's arguments, we discuss (A) asylum, (B) our jurisdiction and standard of review, and (C) the unable-or-unwilling standard that applies to asylum claims based on private persecution.

### A.   Asylum

A noncitizen who fears persecution if removed to a particular country has three avenues for relief: asylum under the INA, withholding of removal under the INA, and withholding of removal or deferral of removal under the Convention Against Torture (CAT).[5] *Niang v. Gonzales*, 422 F.3d 1187, 1193–

---

[5] The CAT is formally referred to as the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85. The United States implemented the CAT through the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105–277, § 2242, 112 Stat. 2681 (1998). *See Elzour v. Ashcroft*, 378 F.3d 1143, 1150 n.8 (10th Cir. 2004).

94 (10th Cir. 2005). Unlike INA-withholding relief or CAT relief, asylum is a discretionary form of relief which may be granted by the Attorney General to eligible noncitizens. *Id.* An asylum grant permits a noncitizen to stay and work in the United States until the grant is terminated. 8 U.S.C. § 1158(c)(1)–(2).

"An asylum application is a two-step process." *Diallo v. Gonzales*, 447 F.3d 1274, 1282 n.4 (10th Cir. 2006). "First, the applicant must show that he is eligible for asylum . . . ." *Id.* Second, if eligible, "he must convince the Attorney General to exercise [her] discretion and grant asylum."[6] *Id.* This petition implicates the first step, eligibility.

To be eligible for asylum, an applicant bears the burden of proving by a preponderance of the evidence that he is a refugee within the meaning of the INA. *Rivera-Barrientos v. Holder*, 666 F.3d 641, 645 (10th Cir. 2012) (citing 8 C.F.R. § 1208.13); 8 U.S.C. § 1158(b)(1)(A). A refugee is a person who is unable or unwilling to return to his country of nationality, and unable or unwilling to avail himself of that country's protection, because of "persecution or a well-founded fear of persecution on account of" any of five protected grounds, including political opinion. 8 U.S.C. § 1101(a)(42). "For persecution to be on account of a statutorily protected ground, the victim's

---

[6] The "Attorney General's discretionary judgment whether to grant [asylum] relief . . . shall be conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D).

protected characteristic must be central to the persecutor's decision to act against the victim." *Rivera-Barrientos*, 666 F.3d at 646 (cleaned up).

Though the INA does not define persecution, we have held that persecution "is the infliction of suffering or harm upon those who differ [on a protected ground] in a way regarded as offensive and must entail more than just restrictions or threats to life and liberty." *Ritonga v. Holder*, 633 F.3d 971, 975 (10th Cir. 2011) (internal quotation marks omitted). "[P]ersecution may be inflicted by the government itself, or by a non-governmental group that the government is unwilling or unable to control." *Id.* (internal quotation marks omitted). We refer to the latter as "private persecution." *See Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1062 (9th Cir. 2017) (en banc) (using "private persecution").

Whether governmental or private persecution, an asylum applicant must prove "past persecution" or a "well-founded fear of future persecution."[7] *Aguilar v. Garland*, 29 F.4th 1208, 1211 (10th Cir. 2022); *see* 8 C.F.R. § 1208.13(b)(1)–(2). Proof of past persecution entitles the applicant to a

---

[7] "To establish a well-founded fear, an applicant must show (1) a genuine, subjective fear of persecution that is (2) objectively reasonable based on credible, direct, and specific evidence in the record." *Aguilar v. Garland*, 29 F.4th 1208, 1213 (10th Cir. 2022) (cleaned up). "For the second element, an applicant must demonstrate a reasonable possibility of future persecution," which can be a chance of future persecution that is "as low as 10 percent." *Id.*

rebuttable presumption of a well-founded fear of future persecution.[8] *Rivera–Barrientos*, 666 F.3d at 646. Applicants can also establish refugee status by proving past persecution so severe as to demonstrate "compelling reasons for being unwilling or unable to return" even when no future danger of persecution exists. 8 C.F.R. § 1208.13(b)(1)(iii)(A). Though he argued both past and fear-of-future persecution before the Board, Singh's present petition challenges only the Board's past-persecution ruling.

To prove past persecution, an applicant must show: (1) an incident that rises to the level of persecution; (2) that was on account of one of the statutorily protected grounds; and (3) that was committed by the government or forces the government was either unable or unwilling to control. *Niang*, 422 F.3d at 1194–95. Singh's petition depends on his ability to meet the third element, which applies if either the government engaged in the past persecution *or* was either unable or unwilling to control a private group's past persecution of the petitioner.

---

[8] The government may rebut this presumption and prevent the grant of asylum by showing (1) a "fundamental change" in circumstances, such that the applicant no longer has a well-founded fear of persecution; or (2) the applicant's ability to "avoid future persecution by relocating to another part of the applicant's country." *Rivera-Barrientos*, 666 F.3d at 646 (quoting 8 C.F.R. § 1208.13(b)(1)(i)).

Singh contends that he suffered past persecution from politically motivated private actors, not from the government.[9] So he must prove that the Indian government was "unable or unwilling to control" those private actors. *Id*. If he does, then he may be entitled to a rebuttable presumption of a "well-founded fear of persecution on the basis of the original claim."[10] 8 C.F.R. § 1208.13(b)(1). Before detailing the unable-or-unwilling standard for private persecution, we pause to review our role at this stage.

**B.    Jurisdiction & Standard of Review**

We generally have jurisdiction to review final orders of removal, which can include a consolidated review of asylum claims. 8 U.S.C. § 1252(a)(1), (b)(9). Our review of the Board's denial of asylum relief is limited to "the administrative record on which the order of removal is based." *Id.*

---

[9] Singh testified that Indian police officers unlawfully arrested and tortured him in 2000. Despite that evidence, Singh's brief does not argue that he suffered past persecution that was "committed by the government." *Niang*, 422 F.3d at 1194. During oral argument, a panel member asked Singh's counsel whether his argument was limited to private persecution. Singh's counsel answered affirmatively. So governmental persecution is not before us, and we may consider only whether Singh proved past, private persecution.

[10] To acquire the rebuttable presumption, Singh must prove every past-persecution element. 8 C.F.R. § 1208.13(b)(1). The IJ determined that Singh failed to prove the unable-or-unwilling element and that he failed to prove that he was persecuted on account of his political opinion. The Board affirmed on only the unable-or-unwilling element and that is the only issue before us. So even if Singh's unable-or-unwilling arguments were to succeed on judicial review, he would still need to show on remand to the Board that the IJ erred in finding that he had not shown past persecution on account of his political opinion.

§ 1252(b)(4)(A). Our scope is further limited by "the form" of the Board's asylum decision. *Htun v. Lynch*, 818 F.3d 1111, 1118 (10th Cir. 2016) (internal quotation marks omitted). Where, as here, a single Board member affirms the IJ's decision in a brief order, we consider only the grounds relied upon by the Board. *Id.* In doing so, we can consult "the IJ's more complete explanation of those same grounds." *Id.* (internal quotation marks omitted). As stated, Singh challenges only the Board's unable-or-unwilling ruling for past, private persecution. So our review is limited to that ground.[11]

We generally have jurisdiction to review both factual and legal challenges to the Board's unable-or-unwilling decision. 8 U.S.C. § 1252(a)(1), (b)(9). We review legal questions de novo, *Addo v. Barr*, 982 F.3d 1263, 1268

---

[11] "In addition to generally limiting our review to what the [Board] decided, we also generally limit appellate review to what the parties present to us." *Gurchiani v. Garland*, No. 23-9588, 2025 WL 46446, at *4 (10th Cir. Jan. 8, 2025) (unpublished). We note that the Board found that Singh failed to prove past persecution *and* fear-of-future private persecution. When an applicant proves past persecution, he or she is entitled to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). So the past-persecution analysis can converge into a fear-of-future persecution analysis. But the Board did not analyze Singh's alleged fear-of-future persecution as if he had proven past persecution; that is, the Board did not afford Singh the rebuttable presumption of a well-founded fear of future persecution. And because Singh would be entitled to that presumption if he proved past persecution, we do not see Singh's failure to challenge the Board's fear-of-future persecution finding as precluding our ability to review the past-persecution finding under our preservation doctrine. *Cf. Gurchiani*, 2025 WL 46446, at *4–5 (explaining that when a party fails to challenge one of the BIA's dispositive grounds, we consider that challenge waived and therefore need not review a preserved challenge to an alternative, dispositive ground).

15

(10th Cir. 2020), such as whether the Board misinterpreted the unable-or-unwilling standard, *Madrigal v. Holder*, 716 F.3d 499, 506 (9th Cir. 2013). But we review the Board's factual findings under the substantial-evidence standard. *Addo*, 982 F.3d at 1268. Whether a noncitizen has proved past private persecution in their home country—the overarching issue here—is a fact question.[12] *Vicente-Elias v. Mukasey*, 532 F.3d 1086, 1091 (10th Cir. 2008).

Under the substantial-evidence standard, the administrative "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). In applying this "highly deferential" standard, *Nasrallah v. Barr*, 590 U.S. 573, 583 (2020), "we do not weigh evidence or independently assess credibility," *Htun*, 818 F.3d at 1119. "[O]ur duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole." *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004).

And yet, our deference is not boundless. The Board cannot "simply overlook," "ignore," or "misconstrue" evidence when factfinding. *Karki v. Holder*, 715 F.3d 792, 800 (10th Cir. 2013) (internal quotation marks omitted).

---

[12] Under *Vicente-Elias v. Mukasey*, the persecution requirement is treated as a fact question "even if the underlying factual circumstances are not in dispute and the only issue is whether those circumstances qualify as persecution." 532 F.3d 1086, 1091 (10th Cir. 2008). Circuit courts are split on whether that is the right approach. *Xue v. Lynch*, 846 F.3d 1099, 1104, 1105 n.11 (10th Cir. 2017) (flagging circuit split and calling our approach into serious doubt). But Singh does not raise the issue.

But the Board need not discuss "every piece of evidence" in rendering its decision. *Hadjimehdigholi v. INS*, 49 F.3d 642, 648 n.2 (10th Cir. 1995). We presume the Board has considered the whole record. *Batalova v. Ashcroft*, 355 F.3d 1246, 1252 (10th Cir. 2004). Our task is to determine whether "any reasonable adjudicator would be compelled to conclude to the contrary" of the Board given that record. 8 U.S.C. § 1252(b)(4)(B).

### C.    The Unable-or-Unwilling Standard

As discussed above, an asylum claim based on past, private persecution requires an applicant to prove by a preponderance of the evidence that he or she suffered persecution from private forces that the government was "either unable or unwilling to control." *Niang*, 422 F.3d at 1194–95 (internal quotation marks omitted). A few principles guide the unable-or-unwilling analysis.

To begin, an applicant need not prove both inability and unwillingness. It suffices to show either that the government was *unable* to control persecutors "*or*" that the government was *unwilling* to control persecutors. *See id.* (emphasis added). An able but unwilling government (or a willing but unable government) no more protects its people from private persecution than an unable and unwilling government. *See Madrigal*, 716 F.3d at 506–07 (remanding where the Board considered willingness but not ability to control persecution). That said, the same evidence often proves or undermines both a government's inability and its unwillingness to control private actors. So though an applicant can prove inability or unwillingness, courts typically

17

analyze both at the same time. *See Ritonga*, 633 F.3d at 976; *K. H. v. Barr*, 920 F.3d 470, 476–78 (6th Cir. 2019); *Bringas-Rodriguez*, 850 F.3d at 1073–74.

For inability and unwillingness, the analysis is a "fact-specific inquiry based on consideration of all evidence." *In re C-G-T-*, 28 I. & N. Dec. 740, 740 (BIA 2023). But that evidence usually falls into two categories: (1) the country's conditions, and (2) the government's response to an asylum applicant's alleged persecution.[13] *See Aviles-Gonzalez v. Garland*, No. 23-9547, 2024 WL 3066987, at *2–3 (10th Cir. June 20, 2024) (unpublished) (considering both the government's response to specific acts of past persecution and country conditions); *K. H.*, 920 F.3d at 476–78 (same); *Bringas-Rodriguez*, 850 F.3d at 1074–75 (same).

Country-conditions evidence "allows an adjudicator to consider a country's practices more generally and gives a broader picture of the social,

---

[13] These two evidentiary categories developed as the theories of private persecution evolved. *Bringas-Rodriguez*, 850 F.3d at 1059–62 (outlining the evolution of refugee law and the unable-or-unwilling standard). In years past, "whether a government was unable or unwilling to control private persecution almost exclusively involved a fear of future persecution by organized groups, such as anti-government guerillas." *Id.* at 1062. For those cases, "either it was undisputed that the government was unable or unwilling to control the powerful organizations at issue, or the inability to control was proved through documentary evidence, such as country conditions reports." *Id.* But later petitions for review, like the one here, did not involve persecution at the hands of powerful, organized groups. *Id.* at 1063. Instead, they "involved claims for relief based on past persecution by unorganized groups and individuals." *Id.* For those cases, "where the petitioner was required to show that previous attacks were committed in the shadow of an acquiescent government," courts began looking at "evidence of how the police responded to the petitioner's requests for protection." *Id.*

economic, and cultural realities of a country." *K. H.*, 920 F.3d at 476. Among other things, the evidence informs how certain groups are treated, how crimes are prosecuted and punished, and how the government generally protects people. Country-conditions evidence can independently establish a government's inability or unwillingness to control private persecutors, especially when the government is dealing with powerful, organized private groups. *See Gomez-Saballos v. INS*, 79 F.3d 912, 916–17 (9th Cir. 1996) (concluding that "documentary evidence about general conditions in Nicaragua" was enough to show that the government was "unable to control" former National Guard members).

Alongside country-conditions evidence, the unable-or-unwilling analysis also considers evidence about a government's response to an applicant's past persecution. *Ritonga*, 633 F.3d at 976. Two types of information weigh heavily when considering a government's response to persecution: (1) whether the government stopped or tried to stop the persecutors (that is, whether the police investigated, apprehended, prosecuted, and punished the persecutors), and (2) whether the government offered protection to the applicant, such as by placing the applicant in protective custody. *See id.* (explaining that a government's investigation and apprehension of alleged persecutors undermined an asylum applicant's unable-or-unwilling contention); *Galdamez-Peraza v. Garland*, No. 24-9517, 2024 WL 4563942, at *4 (10th Cir. Oct. 24,

19

2024) (unpublished) ("Police investigation undermines an argument that the government is unwilling or unable to control offenders.").

But those considerations depend on the government's having notice of the persecution and an opportunity to respond. Without such notice, "there is no way to know how the police would have reacted or whether the government would have helped." *Osorio-Morales v. Garland*, 72 F.4th 738, 744 (7th Cir. 2023). For that reason, a key fact to the analysis is whether an applicant reported past persecution to the government. *See Afriyie v. Holder*, 613 F.3d 924, 931 (9th Cir. 2010) (explaining that the authorities' response, or lack thereof, to reports of persecution "may provide powerful evidence with respect to the government's willingness or ability to protect the requestor"), *overruled on other grounds by Bringas-Rodriguez*, 850 F.3d at 1070.

A failure to report can undercut a claim that the government was unable or unwilling to control the persecutors. *Aviles-Gonzalez*, 2024 WL 3066987, at *2. But such a failure is "not necessarily fatal" to the applicant's unable-or-unwilling claim if the applicant "can otherwise demonstrate that filing a police report would have been futile or dangerous." *Id.* (quoting *In re C-G-T-*, 28 I. & N. Dec. at 743–44); *accord Bringas-Rodriguez*, 850 F.3d at 1073–74 (reiterating that an applicant need not report abuse when reporting would have been "futile" or "dangerous").

In sum, the unable-or-unwilling analysis is a fact-specific inquiry based on all the evidence. To satisfy the unable-or-unwilling standard, an applicant

20

need prove only that the government was unable *or* unwilling to control private persecutors. For either, an applicant can rely on any relevant evidence, including the country's conditions and the government's response to private persecution. When an applicant relies on the government's response to private persecution of which the government was unaware, he or she must show that reporting the persecution to authorities would have been futile or dangerous.

## II.     Analysis

With that context in mind, we turn to Singh's challenges to the Board's ruling that he failed to prove that India was unable or unwilling to protect him from private persecutors—namely, Badal members with anti-Mann sentiment. We first consider Singh's argument that the Board committed legal error by misinterpreting the unable-or-unwilling standard. Then we consider Singh's argument that the Board's ultimate factual determination was unreasonable under the substantial-evidence standard.

### A.     Legal Challenge

Singh contends that the Board "misapplied the 'unable or unwilling to control' analysis" by considering the Indian government's willingness—but not its ability—to control his persecutors. Pet. Br. at 29. As explained above, we agree with Singh's underlying premise that willingness-to-control and ability-to-control are alternatives. An applicant need prove only one to meet the element for private persecution.

21

So had the Board considered only India's willingness to protect Singh or considered only India's ability to protect him, that would have been legal error. *See Madrigal*, 716 F.3d at 506 (holding that the Board committed legal error by focusing solely on a government's willingness, but not its ability, to control private persecution). But that's not what happened. The Board considered both India's willingness *and* ability to protect Singh from persecution. *See* AR at 4 (reasoning that Singh failed to "show that the Indian government was unable or unwilling to protect him").

Granted, the Board considered certain evidence to be probative of both requirements, such as country reports, India's exoneration of Singh on the fabricated criminal charge, and Singh's failure to report attacks against him to the police. But we have never required that ability and willingness be considered under separate headings based on different evidence. Instead, when the same facts tend to "undercut the notion" that a government was unable and unwilling to protect an applicant, we have considered ability and willingness together. *Aviles-Gonzalez*, 2024 WL 3066987, at *3 (finding that a failure to report private persecution was relevant to both the unable and unwilling inquiries); *see Ritonga*, 633 F.3d at 976 (finding that a police investigation into a discriminatory assault "undermine[d]" the argument that the "government was unwilling or unable to control" the assailants (internal quotation marks omitted)).

22

The Board considered India's ability and its willingness to control Singh's persecutors based on evidence that was relevant to both inquiries. We do not see that as a misapplication of the unable-or-unwilling standard.

**B.    Factual Challenge**

To prevail on his factual challenge to the Board's unable-or-unwilling ruling, Singh must convince us that the administrative record compels "any reasonable adjudicator" to find that India was either unable or unwilling to protect him from private persecutors. 8 U.S.C. § 1252(b)(4)(B). We conclude that the record does not compel that finding. We discuss Singh's evidence about (1) India's response to Singh's persecution, and (2) the conditions in India.

**1.    Government's Response**

Singh references two instances that he says show that India was unable and unwilling to control private persecutors: (1) his wrongful arrest and torture in 2000 by police officers, who Singh alleges were influenced by the Badal party; and (2) nongovernment Badal members assaulting him in 2017 because of his political affiliation with the Mann party.

The Board determined that Singh's arrest in 2000 did not show that the Indian government was unable or unwilling to protect Singh because—though his arrest was wrongful—Singh was "cleared of all false charges and the police officers, who fabricated the false charges against [Singh], were removed from their positions." AR at 4. We recognize that the officers were punished for

corruption unrelated to Singh's unlawful arrest—which provides less support for India's response than had the officers been arrested because of Singh's mistreatment.[14] But still, as Singh seems to admit, India's arresting Singh's persecutors helps show its ability and willingness to control them. *See* Pet. Br. at 26 (noting that the disciplinary action "shows some effort on part of the authorities to stop official corruption").

And though not explicitly referenced by the Board, another record-bound fact supports the Board's finding: Singh never reported that he was abused by the police officers. AR at 136 ("Q: Did you and your attorney report that abusive treatment to higher authority? . . . A: No."). So even without its being informed of the physical abuse, India's judicial system provided him with relief—bail, acquittal, and an acknowledgment that he had been "framed." *Id.* at 226. Given that India removed Singh's abusers of their power, that India cleared Singh of the false charge, and that Singh never reported the physical abuse surrounding that false charge, we think the record supports the Board's finding that India willingly and ably responded to Singh's unlawful treatment in 2000.[15]

---

[14] Neither the IJ nor the Board erroneously found that India arrested the officers *because* of Singh's situation. Rather, they accurately recognized that Singh was cleared of the false charges and that the charging officers were arrested for corruption.

[15] We emphasize that this analysis is confined to the unable-or-unwilling element for private persecution. Whether Singh's evidence amounts to governmental persecution is not before us. *Supra* n.9.

Singh also did not convince the Board that India was unable or unwilling to protect him in 2017—sixteen years after his false arrest—when he was twice attacked by political-opposition members. As the Board noted, Singh never tried to report the February attack by Badal members. Singh did go to the police station to report the August attack, but the police "asked him to return the next day." AR at 4, 150. Though Singh stated that the police "paid [him] no heed" and "kicked" him out of the station, the Board concluded that Singh had failed to support his contention "that the Indian police would not take his report had he returned the next day." *Id.* at 4, 150, 198. In essence, the Board found that Singh had not shown that reporting the attack as the police requested was "futile or dangerous." *Aviles-Gonzalez*, 2024 WL 3066987, at *2; *see Osorio-Morales*, 72 F.4th at 743 ("Although police apathy can indicate a government's unwillingness or inability to protect an applicant, a one-off conversation with an unhelpful officer does not necessarily show that a government is unable or unwilling to protect a victim." (internal quotation marks omitted)).

Singh asserts that the Board's futility determination ignored Singh's unlawful arrest in 2000. But, as discussed, the Board did consider the unlawful arrest in 2000. It just did not make the inference Singh seeks—that the police arresting him in 2000 for attempting to report an attack establishes that the police would not accept his report in 2017. The Board had evidence supporting its decision to not draw that inference. Singh's unlawful arrest was led by police officers who India had removed from their posts. Then sixteen years

25

passed. During that time, the police spoke with Singh's family on several occasions, inquiring into Singh's whereabouts for unknown reasons. But for over a decade, Singh himself had no interactions with the police, even when he resumed advocating for the Mann party. And the police officers in 2017 were different from those in 2000.[16] These facts weigh against finding that Singh's experience with police in 2000 established that reporting persecution to different police officers sixteen years later would have been futile or dangerous.

### 2.     Country Conditions

Singh asserts that the Board "ignored the relevant country conditions evidence" and failed to consider the country reports alongside Singh's personal testimony. Pet. Br. at 26–27. The Board did neither—it considered the relevant country-conditions evidence in totality with Singh's personal experiences.

As for the substance of Singh's country-conditions evidence, Singh submitted evidence supporting his fear of the police. A 2017 report from the U.S. Department of State notes that Indian officials often engage in "corrupt

---

[16] Singh suggests that the police officers in 2000 are like the police officers in 2017 because the Badal party was in power during both years and it "had the ability to influence the police." Pet. Br. at 20. But aside from his subjective belief that the 2017 officers "worked" for the Badal party, AR at 158, he cites no evidence compelling the finding that they were Badal members, that they would be unable or unwilling to protect him based on their political affiliations, or that rival political parties used the police to cover-up private attacks against Mann members, *see id.* at 52 (noting that a Badal and BJP "conspiracy" to "oppress Sikhs, or in particular the Mann party members, is not borne out in the record").

practices with impunity," AR at 312, and that "[a] lack of accountability for misconduct" infects "all levels of [Indian] government," *id.* at 279. According to the report, India's "most significant human rights issues included police and security force abuses, such as extrajudicial killings, disappearance, torture, arbitrary arrest and detention, rape, harsh and life-threatening prison conditions, and lengthy pretrial detention." *Id.*

That evidence weighs against India's ability and willingness to protect Singh. But it does not compel an unable-or-unwilling finding. First, the bulk of the evidence reflects generalized corruption, not sectarian corruption in Punjab against Mann advocates. Second, the country-conditions evidence is not one-sided; it contains evidence that supports India's ability and willingness to control corruption and political persecution. *See Chicas-Mejia v. Garland*, 856 F. App'x 772, 776 (10th Cir. 2021) (upholding the Board's unable-or-unwilling finding where the evidence was sufficiently "mixed"). For example, though the Department of State report found instances of officials "acting with impunity," it also found instances when officials were "held accountable for illegal actions," explaining that India criminalized corruption and brought cases against law-enforcement officers. AR at 287. The report also notes that India is a democracy with free-and-fair elections and a judicial system that provides remedial avenues for "cases involving allegations of corruption and partiality." *Id.* at 279, 291. And another report states that the Punjab and Haryana High

27

Court has held that Mann members, like Singh, can lawfully demand Sikh independence from India.

Given the generality and mixed-nature of Singh's country-conditions evidence, we cannot say that it shows that it would have been futile or dangerous for Singh to report the 2017 attacks, or that it otherwise compels an unable-or-unwilling finding.

\* \* \*

Considering the entire administrative record—including India's specific response to Singh's alleged persecution alongside India's general conditions—any reasonable adjudicator would not be compelled to conclude that the Indian government was unable or unwilling to protect Singh from private sectarian persecution. So under the highly deferential substantial-evidence standard, the Board's finding is conclusive.[17]

## CONCLUSION

We deny the petition for review.

---

[17] One last point. Singh argues that the IJ incorrectly found that his alleged persecution was not on account of his political beliefs. Pet. Br. at 19–21. According to Singh, that erroneous finding "infected" the separate unable-or-unwilling analysis. *Id.* at 19. But the Board's unable-or-unwilling ruling did not depend on whether Singh was persecuted because of his political beliefs, or for some other reason. Rather, the Board's analysis assumed—as ours does—that Singh was arrested in 2000 and attacked in 2017 because he is a Mann advocate.